**ITEK CORPORATION, a Delaware corporation, Plaintiff Below, Appellant,**

v.

**CHICAGO AERIAL INDUSTRIES, INC., a Delaware corporation; Fred T. Sonne; Adele F. Loeb Saks, individually and as surviving Executrix of the Estate of Ernest G. Loeb, Deceased; Elizabeth S. Loeb, Albert H. Loeb, II, and Henry S. Loeb, individually and as surviving Executors of the Estate of Allan M. Loeb, Deceased; Alyn M. Loeb, Jane L. Sooy, Elizabeth Loeb Nathan, and Virginia Loeb; David Levinson and Victor C. Milliken, Defendants Below, Appellees.**

No. 127.

Supreme Court of Delaware.

July 10, 1968.

Alexander L. Nichols and James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Harold M. Willcox, of Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., for appellant.

E. N. Carpenter, II, and Charles F. Richards, Jr., of Richards, Layton & Finger, Wilmington, for Chicago Aerial Industries, Inc., and Fred T. Sonne (Deceased).

Bruce M. Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington, for Adele F. Loeb Saks, as surviving executrix of the Estate of Ernest G. Loeb, deceased, Elizabeth Loeb Nathan and Virginia Loeb.

William Poole, of Potter, Anderson & Corroon, Wilmington, and Earl E. Pollock and Alan H. Silberman, of Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., for Elizabeth S. Loeb, Albert H. Loeb, II, and Henry S. Loeb as surviving executors of the Estate of Allan M. Loeb, Deceased and Albert H. Loeb, II, individually.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice.

This is an appeal by Itek Corporation (Itek) from the grant of summary judgment for the defendants in a breach of contract action brought by Itek against Chicago Aerial Industries, Inc. (CAI) and individuals who collectively represented in the contract negotiations CAI and its controlling stockholders.

Both Itek and CAI are producers of photographic equipment. At the time of the events which ultimately led to this litigation, approximately 50% of the CAI stock was owned by its president and by the estates of two of its founders. The beneficiaries of the estates, particularly, desired to obtain cash for their CAI stock in order to diversify investments. Accordingly, in early 1964 the individual defendants, who made up a committee for the purpose, began to look for a way to realize cash for their CAI stock.

In the spring of 1964, Itek became interested in the acquisition of CAI's assets, either by merger or otherwise. CAI was interested in a combination of some sort

with Itek which would produce cash for its stockholders.

Negotiations reached a climax in the fall of 1964 with the conditional acceptance by CAI of an offer by Itek to purchase all of CAI's assets at a total price based upon $12.00 per share of CAI stock plus one-twentieth of a share of Itek. This offer was intended to permit the passing on to CAI stockholders of approximately $13.00 per share in cash.

Ultimately, the agreement of the principal CAI stockholders to the Itek offer was obtained and the CAI Board agreed to recommend acceptance of the offer to the other CAI stockholders. The CAI acceptance was transmitted by telephone to Itek on January 4, 1965 subject to the following conditions:

(1) That Itek obtain the necessary financing;

(2) That an informal letter of intent be executed;

(3) That the details be worked out, and

(4) That formal documents be prepared to the satisfaction of the parties.

Itek arranged for the necessary financing and, on January 15, 1965, a letter of intent was drafted and signed by the parties. Since the letter is of prime importance in this lawsuit, it is set out in full:

"ITEK CORPORATION

"January 15, 1965

"Chicago Aerial Industries, Inc.
550 West Northwest Highway
Barrington, Illinois

"Gentlemen:

"This is to confirm the terms on which Itek Corporation (Itek) and Chicago Aerial Industries, Inc. (CAI) have agreed, with the approval of their respective Boards of Directors, to work towards a combination of the two companies through the purchase of the assets and assumption of specified liabilities of CAI by Itek, all subject to adoption of a plan of liquidation and approval of such sale by CAI stockholders:

"1. The purchase price to be paid by Itek for all of the assets of CAI (including name and goodwill), subject to the liabilities to be assumed by Itek, is $6,759,-600 in cash plus 28,165 shares of Itek common stock, par value $1.00 per share, subject to proportionate increase for outstanding CAI stock options exercised after December 31, 1964. The liabilities of CAI to be assumed by Itek are only those which shall be shown in CAI's balance sheet as of December 31, 1964, together with any liabilities incurred in the ordinary course of business after that date and such other liabilities of CAI as the parties may agree upon.

"2. Itek and CAI shall make every reasonable effort to agree upon and have prepared as quickly as possible a contract providing for the foregoing purchase by Itek and sale by CAI, subject to the approval of CAI stockholders, embodying the above terms and such other terms and conditions as the parties shall agree upon. If the parties fail to agree upon and execute such a contract they shall be under no further obligation to one another.

"3. Pending the completion of the contract CAI will permit Itek and its representatives to examine CAI's finances, contracts and business and interview its officers and customers, all as designated by CAI, it being understood that CAI shall not be obligated to divulge trade secrets or confidential matters.

"4. Itek represents to CAI that Itek has received assurance from Time, Incorporated that Time, Incorporated, subject to the approval of its Board of Directors, is prepared to invest $4,350,000 in Itek convertible debentures and stock, and has received assurance from a director of an investment company that it is prepared to invest $1,200,000 for such deben-

tures and stock. Both such investments would be contingent upon and for the purpose of financing the purchase by Itek of CAI assets.

"5. A joint announcement to the press in the form attached shall be made by both companies on the afternoon of January 19, 1965, for publication in the morning papers January 20.

"If you agree to the foregoing please so indicate by signing and returning the enclosed copy of this letter.

"Yours very truly,

"ITEK CORPORATION

"By Edwin D. Campbell
"Executive Vice President

"AGREED:
"CHICAGO AERIAL INDUSTRIES, INC.
"By Fred T. Sonne—President"

Thereafter, the parties commenced the preparation of a formal agreement. On February 23, 1965 CAI claimed that its potential tax liability would prohibit assuring the uncommitted CAI stockholders of an immediate distribution of $13.00 per share. Accordingly, CAI requested that Itek place a $3.00 floor on the value of the one-twentieth of a share of its stock, establish an escrow fund of $2.00 per share of CAI stock for the payment of all CAI liabilities, and guarantee payment of all CAI liabilities in excess of the escrow fund. Itek immediately agreed and so advised CAI on February 26, 1965.

Meanwhile, early in February, 1965, one of the committee representing CAI and its largest stockholders succeeded in reviving an earlier interest in purchasing CAI stock by Bourns, Inc. This culminated in a luncheon meeting between him and a Bourns representative on February 15, 1965. At this meeting, an offer was outlined under which Bourns would purchase the largest stockholders' CAI stock at $16.00 per share.

On February 23, 1965, as noted above, Itek and CAI representatives met and Itek agreed to the three new conditions insisted upon by CAI. Upon the departure of the Itek representatives, the CAI committee met with the representative of Bourns who was told that the CAI-Itek negotiations had reached an impasse and that they were free to go ahead with Bourns. On February 25, 1965 the formal Bourns offer was mailed, and on February 26, 1965 the principal stockholders accepted $1,000,000.00 in earnest money to cover the eventual sale of their CAI stock to Bourns at $16.00 per share.

On March 2, 1965 CAI by telegram notified Itek that it was terminating the transaction as a result of unforeseen circumstances and the failure on the part of the parties to reach agreement. This lawsuit followed.

Itek argues that the letter of January 15, 1965 is a binding contract and that CAI breached it by willfully refusing to negotiate in good faith toward the completion of the deal.

CAI argues that the letter of January 15, 1965 was, at most, a statement of intent, and was in no sense a binding contract. In particular, it points to the last sentence of paragraph 2 of the letter. That sentence is, "If the parties fail to agree upon and execute such a contract they shall be under no further obligation to one another." The argument is that since the parties in fact failed to agree upon a formal contract, the quoted sentence absolves CAI from liability.

The negotiations in this matter and all pertinent actions took place in Chicago which makes the law of Illinois applicable in the determination of whether or not Itek and CAI entered into an enforceable contract. Wilmington Trust Co. v. Pennsylvania Company, 40 Del.Ch. 1, 172 A.2d 63. We accordingly look to the law of Illinois to determine initially whether or not under any provable facts there is in

existence an enforceable contract between Itek and CAI.

■ Under Illinois law, the question of whether an enforceable contract comes into being during the preliminary stages of negotiations, or whether its binding effect must await a formal agreement, depends on the intention of the parties. El Reno Wholesale Grocery Co. v. Stocking, 293 Ill. 494, 127 N.E. 642. In making that determination, the fact that some matters are left for future agreement among the parties does not necessarily preclude the finding that a binding agreement was entered into during the preliminary stages. Borg-Warner Corporation v. Anchor Coupling Co., 16 Ill.2d 234, 156 N.E.2d 513, 930.

■ In making that determination, the trier of fact, of necessity, must look at the circumstances surrounding the negotiations and the actions of the principals at the time and subsequently. Borg-Warner Corporation v. Anchor Coupling Co., supra. From all of these, the intention of the parties to be bound or not to be bound must be ascertained.

The trial judge, however, reached his decision solely because of the last sentence of paragraph 2 of the January 15, 1965 letter to the effect that the failure to execute a formal contract absolved the parties from "further obligation." We think, however, that it was error to separate the last sentence from the rest of paragraph 2. All its provisions must be read and considered together. If this is done, then it is apparent that the parties obligated themselves to "make every reasonable effort" to agree upon a formal contract, and only if such effort failed were they absolved from "further obligation" for having "failed" to agree upon and execute a formal contract. We think these provisions of the January 15 letter obligated each side to attempt in good faith to reach final and formal agreement.

■ We think the first issue to be resolved in this case is the existence or non-existence on January 15, 1965 of an enforceable agreement. If there was none, then obviously Itek's case falls. Under Illinois law, this decision is to be reached after consideration of the surrounding circumstances and what the parties intended and believed to have been the result. This does not violate the parol evidence rule since that rule comes into play only after the existence of a contract has been determined. 3 Corbin on Contracts, § 577.

We have examined the record before us and are of the opinion that there is evidence which, if accepted by the trier of fact, would support the conclusion that on January 15, 1965 both Itek and CAI intended to be bound, the former to purchase and the latter to sell all the assets of CAI. There is also evidence which, if accepted by the trier of fact, would support the conclusion that subsequently, in order to permit its stockholders to accept a higher offer, CAI willfully failed to negotiate in good faith and to make "every reasonable effort" to agree upon a formal contract, as it was required to do. We do not say that the evidence requires these conclusions, particularly since they are contested by CAI, but we think the evidence would permit these conclusions.

■ There were, then, issues of material fact unresolved which make the disposition of the case against CAI on summary judgment inappropriate. CAI has failed to demonstrate to a reasonable certitude that there is no issue of fact which, if resolved in favor of Itek, would have held CAI liable. Therefore, summary judgment for CAI was improvidently granted. Allied Auto Sales, Inc. v. President, Directors and Company of Farmers Bank, Del., 216 A.2d 666.

With respect to the individual stockholders of CAI, a different situation exists. The contract, if there is a contract, was to purchase the assets of CAI at a price determined by a per share price of CAI stock. There was no contract between Itek and the CAI stockholders. This being the fact,

it was proper to enter summary judgment in their favor.

The judgment below in favor of CAI will be reversed, and the judgment below in favor of the individual defendants will be affirmed.

## ON PETITION FOR REARGUMENT

Itek petitioned for reargument of our holding that no view of the evidence would warrant a finding that there was an enforceable contract between Itek and the principal stockholders of C.A.I. This holding required us to affirm the summary judgment in favor of the principal stockholders. We granted the petition, heard oral reargument and have concluded that we will not disturb our ruling.

Itek argues that the C.A.I. principal stockholders promised directly to Itek that they would support and vote for the proposition made by Itek to C.A.I., and would do nothing in derogation of it. Hence, it is argued that the action of the principal stockholders, i. e., the subsequent sale of their stock to a third party at a higher price, was a breach of this promise, since, by so doing, the principal stockholders made it impossible for C.A.I. to live up to its agreement with Itek.

We think, however, the record contains no support for the contention that the principal stockholders made a promise directly to Itek.

Principal reliance is made by Itek upon a telephone call of January 4, 1965, made by Victor C. Milliken of C.A.I. to the president of Itek, recorded in Milliken's contemporaneous memorandum, to the effect that the principal stockholders accepted the offer of $12.00 per share plus ⅟₂₀th of an Itek share, and that the C.A.I. Board would recommend acceptance to the other stockholders. Milliken in the same conversation stated that all of this was subject to the conditions later substantially included in the letter of January 15, 1965.

Subsequent to the telephone call of January 4, 1965, Milliken obtained written ratification from the principal stockholders of their approval of the Itek offer and commitment to vote their shares in favor of it. These ratifications were in the following form:

"The undersigned, a stockholder of Chicago Aerial Industries, Inc., hereby ratifies and approves the statement by Victor C. Milliken on behalf of the undersigned to Franklin A. Lindsay, President of Itek Corporation, that the undersigned approves and will vote in favor of accepting the offer of Itek Corporation to purchase all of the assets of Chicago Aerial Industries, Inc. and assume its liabilities at a purchase price in cash equal to $12.00 for each share of the outstanding stock of Chicago Aerial Industries, Inc. plus ⅟₂₀th of a share of Itek Corporation for each such outstanding share on the reasonably satisfactory performance of the following conditions:

"(a) That Itek arrange its financing within a reasonable time;

"(b) That informal letters of intent be exchanged and that Itek's letter will state that the financing has been arranged;

"(c) That the transaction is subject to working out the details;

"(d) That legal documents be prepared to the satisfaction of both parties."

We think a fair reading of the ratifications demonstrates that if, indeed, they constitute a promise to anyone, that promise runs solely to C.A.I. The evident purpose of the ratifications was to assure the Directors of C.A.I. that the submission of the proposition to the other stockholders would not be a fruitless gesture since the ratifications represented approximately 50% of C.A.I. stock. We think it impossible to regard these documents as direct promises to Itek.

Furthermore, there is another important fact which breaks any connecting link between the ratifications and the letter of January 15, 1965, which we have held under Illinois law to be possibly an enforceable contract. This fact is that the arrangement set out in the letter of January 15, 1965 differs materially from the arrangement set out in the telephone conversation and ratified by the stockholders.

The stockholders ratified a cash sale of C.A.I. assets at a certain price measured in terms of one C.A.I. share, and the assumption by Itek of the C.A.I. liabilities. The letter of January 15, 1965 contained the same cash offer measured in terms of a price per C.A.I. share, but the assumption of C.A.I. liabilities by Itek was reduced to only those liabilities shown on C.A.I.'s balance sheet of December 31, 1964. Not included on this balance sheet was a possibly impending tax assessment against C.A.I. which, if successful, might materially reduce the amount of cash ultimately to be received by the C.A.I. stockholders.

We regard the January 4, 1965 telephone call as but one step in the negotiations between Itek and C.A.I. which culminated in the letter of January 15, 1965. It was in no sense a contract between Itek and the principal stockholders of C.A.I.

It follows, therefore, that the entry of summary judgment in favor of the principal stockholders was correct and will be affirmed.

We point out that we have expressed no opinion upon the question of whether or not, in the event C.A.I. is ultimately found to be liable to Itek, it may proceed against the stockholders on the theory that the ratifications constitute a stockholders' agreement with it. The point is not before us. We hold solely that there is no enforceable agreement between Itek and the C.A.I. principal stockholders.