**PEPSICO, INC., Plaintiff,**

v.

**W. R. GRACE & CO. and Philip Morris Incorporated, Defendants.**

**No. 69 Civ. 2669.**

United States District Court
S. D. New York.

Dec. 29, 1969.

714

Mudge, Rose, Guthrie & Alexander, New York City, for plaintiff; Simpson, Thacher & Bartlett, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendants; Lawrence J. McKay, Michael F. Armstrong, Warren H. Colodner, Kenneth W. Orce, New York City, of counsel.

O-P-I-N-I-O-N

THOMAS F. MURPHY, District Judge.

Defendants move to dismiss the complaint for lack of jurisdiction over the subject matter or, alternatively, for summary judgment.

Plaintiff's first two claims are based upon an alleged violation of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) [1] and Rule 10b–5 of the Securities and Exchange Commission rules (17 C.F.R. § 240.10b–5).[2] Its other two claims are based upon pendent jurisdiction.

At issue is whether there was on May 8, 1969, a contract by Grace to sell and Pepsico to purchase Grace's 53% stock interest in Miller Brewing Company; and if there was, did the defendant Grace and/or Philip Morris use any manipulative or deceptive device or contrivance in contravention of Rule 10b–5.

It is plaintiff's submission that on May 8th "the parties reached an (oral) agreement that Grace was to sell and Pepsico was to buy the Miller shares for a price of $120 million, payable $20 million in cash at the closing and $100 million by promissory note of Pepsico payable in five years bearing interest at 6½% and redeemable by Grace from Pepsico at face at any time between September 30, 1969, and November 30, 1969. This agreement was subject to approval by the board of directors of Grace and negotiation of a definitive purchase agreement. Immediately upon reaching this agreement Grace and Pepsico jointly announced it to the press."

Defendants submit that the *understanding* of May 8th could not have been a contract to purchase Grace's Miller stock since it expressly contemplated the negotiation and *delivery* of just such a

1. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of. the mails or of any facility of any national securities exchange.

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

contract at some indefinite time in the future. In support defendants refer to four written documents; the authenticity of each has not been controverted. The first is the joint press release dated May 8, 1969, on plaintiff's stationery, which reads in part:

"PEPSICO TO BUY INTEREST
IN MILLER BREWING

NEW YORK, May 8, 1969—PepsiCo, Inc. and W. R. Grace & Co. announced today that they had reached agreement in principle for the purchase by PepsiCo of Grace's 53 percent stock ownership in Miller Brewing Company for $120 million in cash and notes. The transaction is subject to approval by the board of directors of Grace and negotiation of a definitive purchase agreement."

The second is a letter dated May 9, 1969, prepared by plaintiff on its stationery which reads:

"May 9, 1969.

W. R. Grace & Co.
7 Hanover Square
New York, New York—10005

Gentlemen:

This will confirm our agreement in principle that you will sell to us 3,243 ⅘ shares of the issued and outstanding capital stock of Miller Brewing Company, a Wisconsin corporation, comprising approximately 53% of the issued and outstanding capital stock of that company, for $120 million.

We are to pay you the purchase price in the following manner:

1. $20 million in cash at the closing (tentatively scheduled for June 2).

2. $100 million by means of a five-year 6½% note of PepsiCo.

In order to assure you that you will be able to dispose of the note at par, it is further understood that you will have a right to demand payment of the full principal amount of the note commencing September 30, 1969.

This agreement in principle is subject to negotiation and execution of a mutually satisfactory purchase agreement and neither of us will be under any legal obligation with respect to this transaction unless and until such an agreement is executed and delivered.

If the foregoing correctly sets forth our understanding, kindly so indicate by executing the attached duplicate hereof and returning it to us.

Very truly yours,

PEPSICO, INC.

By /s/ Robt. J. Abernathy.

CONFIRMED:

W. R. GRACE & CO.

By /s/ K. A. Lawder."

The third document is a supplement to plaintiff's prospectus dated May 23, 1969, filed by plaintiff with the Securities and Exchange Commission on May 29th:

"SUPPLEMENT TO PEPSICO, INC.
PROSPECTUS DATED May 23,
1969.

PepsiCo has agreed in principle to acquire approximately 53% of the outstanding stock of Miller Brewing Company ("Miller") from its present holder, W. R. Grace & Co., for $20,000,000 cash and $100,000,000 in 6½% Notes of PepsiCo.

Miller, a privately owned company, is engaged in the brewing and marketing of beer, primarily under the trademark "Miller High Life". According to information furnished to PepsiCo by W. R. Grace & Co., at December 31, 1968 Miller had total assets of $90,765,291 and net worth of $71,697,731.

Miller's net sales (gross sales less freight, discounts, allowances and federal and state alcoholic beverage taxes) for the periods indicated are set forth below:

|  | Net Sales | Net Income |
|---|---|---|
| 1966 | $111,952.657 | $8,345,455 |
| 1967 | 126,046,883 | 9,586,120 |
| 1968 | 135,362,842 | 9,035,418 |

Consummation of the acquisition is contingent upon execution of a definitive agreement and satisfaction of a number of conditions. No assurance can be given that the acquisition will be consummated.

May 29, 1969."

And the fourth is a second supplement to plaintiff's prospectus dated May 23rd, filed by plaintiff with the Securities and Exchange Commission on June 30, 1969 (11 days after the complaint herein was filed):

"SUPPLEMENT TO PEPSICO, INC. PROSPECTUS DATED MAY 23, 1969

On May 8 and 9, 1969 PepsiCo and W. R. Grace & Co. ("Grace") respectively announced that they had reached agreement in principle for the sale by Grace to PepsiCo of its 53% interest in the outstanding stock of Miller Brewing Company ("Miller") for $20,000,000 cash and $100,000,000 in 6½% notes of PepsiCo, subject to negotiation of a definitive agreement.

On June 11, 1969 Grace advised PepsiCo that it declined to consummate the agreement. On June 12, 1969 Grace announced that it had sold most of its 53% interest in Miller to Philip Morris Inc. and had contracted to sell the balance to Philip Morris Inc. for a consideration in the aggregate of $130,000,000 cash. On June 19, 1969 PepsiCo instituted suit against Grace and Philip Morris Inc. seeking among other things delivery of the shares constituting the 53% interest in Miller to PepsiCo.

June 30, 1969."

Although there are many "facts" in the moving and answering papers that relate to events prior and subsequent to May 8th and 9th, the only issues on this motion are: is there a genuine issue of fact as to whether there was an oral contract between the parties on May 8th, and; if there is, is there a genuine issue of fact whether there was any fraud in connection with such contract. If we were permitted to decide the "facts," we would say emphatically that there was in fact no oral contract. Both the documentary evidence and common sense would dictate such a holding; but we are not permitted to decide such issues before trial and, accordingly, we must analyze the affidavits closely to see whether or no the plaintiff presents two genuine issues of fact.

The affidavit of Donald M. Kendall, president of Pepsico, is the only affidavit submitted in opposition to defendants' motion which bears on the events of May 8th, and Mr. Kendall says very little factually. He first says, "First, on May 8, 1969, Grace agreed to sell its Miller stock to Pepsico at a price and on terms which have been worked out between the two parties. Those terms are contained in the resolutions of the *two boards of directors* and in press releases issued by both sides. The agreement was subject to working out the collateral terms necessary to arrive at a definitive purchase-sell agreement." In our opinion these are conclusions and not facts.

Later in his affidavit, in what he calls "greater details," he states: "On May 8, 1969, the Pepsico board of directors

agreed to accept Grace's offer to purchase its 53% interest in Miller for $120 million. An excerpt from the minutes of the board of directors is annexed hereto as Exhibit A. I immediately contacted J. Peter Grace and informed him of the board's action. Mr. Grace stated that we now had a deal. Mr. Grace and I both agreed that since we had reached an agreement on the terms of the purchase, the lawyers on both sides could start the paper work so that we could close the deal as soon as possible. We also agreed that it now was appropriate for us to issue a joint press release. The joint press release which is annexed to the affidavit of Felix Larkin as Exhibit A was released on May 8, 1969, as a result of this discussion. Approval by the Grace board of directors was secured on May 9, 1969, and communicated to us."

What purports to be a copy of the minutes of the Pepsico board of directors reads:

"Mr. Kendall reviewed his *recent negotiations* with Peter Grace, President of W. R. Grace & Company, owner of approximately 53% stock ownership in Miller Brewing Company, and with Harry Johns, the owner of the balance of 47% of the Miller Brewing Company stock through the de Rance Inc. Foundation.

Mr. Kendall stated that it was *Management's recommendation* that the Corporation purchase the approximate 53% stock ownership from W. R. Grace & Company for $120,000,000 in cash and notes.

A memorandum on the *proposal* for the acquisition of approximately 53% of Miller Brewing Company, dated *May 8, 1969,* was then distributed to the Directors. *A copy of said memorandum will be retained in the files of the Secretary.*

At this point Messrs. William Kanaga, Partner, Arthur Young & Company; James G. Frangos, Partner, Mudge, Rose, Guthrie & Alexander; Edson E. Beckwith, Assistant Treasurer, and Edward C. Lahey, Jr., Assistant General Counsel, entered the meeting.

The Board then discussed the financial, legal, commercial and administrative questions regarding the proposed purchase. The Directors put many questions to Mr. DeLuca, Mr. Kanaga and Mr. Frangos, which were answered by them.

After full discussion, in which all the Directors participated, the following preamble and resolutions were unanimously adopted:

WHEREAS, in the opinion of the Board of this Corporation, the acquisition of approximately 53% of the outstanding stock of Miller Brewing Company, *on the terms and conditions set forth in the presentation to this meeting,* is deemed in the best interests of the Corporation.

NOW, THEREFORE, BE IT

RESOLVED: That *the plans outlined at this meeting contemplating* the purchase by the Corporation from W. R. Grace & Co. of its 53% stock interest in Miller Brewing Company for a consideration of $120,000,000 comprised of $20,-000,000 cash *and $100,000,000 principal amount of notes, all as set forth in the presentation to the Board,* be, and they hereby are, in general, approved.

RESOLVED: That the proper officers of this Corporation be, and they hereby are, authorized to:

(a) *negotiate and enter into an agreement* with W. R. Grace & Co. to effect such purchase, such agreement or agreements and any other necessary documents or instruments to be in form and substance satisfactory to the President and the General Counsel of this Corporation;

(b) *fix, determine and approve,* on behalf of this Corporation *with respect to any such promissory notes* the following: *the interest rate*

thereon, *redemption terms, maturity date,* and the *terms upon which the holders of said notes may exercise, within a certain limited period, the right to demand payment of the full principal amount of said notes prior to maturity;*

(c) assign, in the event they determine it advisable and in the best interests of this Corporation, to a newly organized wholly-owned subsidiary of this Corporation the rights of this Corporation under any such agreement and in connection therewith to unconditionally guarantee the notes of such subsidiary to be substituted as part of the consideration for the purchase of the Grace shares of Miller Brewing Company in lieu of notes of this Corporation; and

(d) organize a wholly-owned subsidiary of this Corporation to be incorporated in the State of Delaware and to purchase all of the capital stock of said Corporation, consisting of 1,000 shares of Common Stock, par value $1 per share, for cash at $1 per share or an aggregate cash consideration of $1,000." (Emphasis added).

It will be observed that the purported minutes are undated, and we have emphasized what we think are particularly relevant passages. There is not attached to Mr. Kendall's affidavit the copy of the memorandum referred to as being kept in the files of the secretary.

The minutes of the board of directors of Grace referred to by Mr. Kendall read as follows:.

"It was reported that further negotiations had been conducted with respect to the sale of Miller Brewing Company and that it would be necessary to revise the terms of the transaction as authorized at the February 1969 meeting.\ Accordingly, the resolutions adopted at such meeting in connection therewith were cancelled and the following were, on motion duly adopted,

RESOLVED that this Corporation sell to PepsiCo, Inc., a Delaware corporation ("PepsiCo"), the 3,243 ⅘ths shares of the capital stock of Miller Brewing Company owned by this Corporation for the sum of $120,000,000, payable $20,000,000 in cash at the closing under an agreement providing for such sale, and $100,000,000 by a promissory note of PepsiCo, payable in five years and bearing interest at the rate of 6½% per annum, such note to provide for the payment thereof upon demand during the period commencing on September 30, 1969 and ending on November 30, 1969.

RESOLVED FURTHER that the President or any Vice President of the Corporation be and he is hereby authorized, in the name and on behalf of this Corporation, to execute and deliver an agreement providing for the aforesaid sale on the terms specified above, such agreement to contain such other terms, provisions and conditions as the officer executing the same on behalf of this Corporation may deem necessary, proper and desirable.

RESOLVED FURTHER that the proper officers of this Corporation be and each of them is hereby authorized to execute, deliver and file, in the name and on behalf of this Corporation, such stock powers and other instruments of transfer, assignments, applications, agreements and other documents, to take any and all such other action and to make any and all such payments which, in the judgment of any of them, may be necessary, proper or desirable to carry out the intents and purposes of the foregoing resolutions and to observe and to perform and fulfill all of the terms, provisions and conditions of the aforesaid agreement on the part of this Corporation to be observed, performed and fulfilled."

As we stated above, no other facts are submitted in the opposing papers that relate to the events of May 8th.

■ In order to come within section 10b and thus claim federal jurisdiction, plaintiff is relying on an oral contract to purchase a security for $120 million.[3] We hold that the affidavit is insufficient factually to sustain this position. Quite obviously no references are made by plaintiff to the May 9th writing (except as hereinafter described) or to any of the supplements filed with the Securities and Exchange Commission relating to Pepsico's prospectus since all of these documents make it crystal clear that no contract had ever been entered into between the parties.

Even the minutes of the Pepsico board of directors are replete with unresolved matters that are integral parts of a contract, particularly where it relates to the delayed payment of the $100 million, e. g., interest, terms and maturity. When viewed in its entirety without any reference to May 9th or subsequent events, the plaintiff has offered no factual basis in support of its claim that there was a binding oral contract between the parties as of May 8th.

Can a party in opposition to a motion for summary judgment completely ignore relevant written documents submitted with the moving papers that contradict its position and merely rely on its unilateral statement that there was a contract? Is it not like a party claiming a color is white and refusing to comment on the photograph submitted in opposition which quite clearly shows the color to be green? Is a genuine issue of fact created by making a statement by affidavit and then retreating into silence when confronted with directly opposite admissions in writing? If so, the Supreme Court would be well advised to repeal Rule 56.

■ But assuming that we are in error and there is presented a genuine issue of fact as to whether or no there

was a valid contract as of May 8th, a problem still remains because in order to allege a violation of section 10(b) and Rule 10b–5, the plaintiff must also allege, and on a motion for summary judgment present, factual evidence that the defendants Grace and/or Philip Morris practiced fraud in connection with such contract.

In this connection the complaint alleges (¶12) that at the time Grace made the purchase and sale agreement and made the public announcement, Grace was engaged in a conspiracy with others unknown to hold plaintiff available as a purchaser while at the same time seeking to secure a purchaser at a higher price and/or to induce plaintiff by a threat to breach the contract to better the price or the terms. (¶ 18). During the period after the May 8th agreement Grace, in furtherance of the conspiracy, was attempting to secure a purchaser at a better price or terms with the intent of breaching the agreement in the event a better offer was obtained. (¶19). In furtherance of the conspiracy, on June 11, 1969, Grace informed plaintiff it would not accept $120 million cash which plaintiff offered on June 9th and it would not live up to the May 8th agreement. (¶20). Among those dealt with by Grace in furtherance of the conspiracy was Philip Morris who participated in the conspiracy by negotiating with Grace with knowledge of the May 8th agreement and on June 12th agreed to buy the Miller stock for $130 million. (¶22). The defendants Grace and Philip Morris, and others acting with them in the conspiracy, failed to disclose material facts, concealed material facts and engaged in various manipulative acts in violation of section 10(b) and Rule 10b–5, making use of the United States mail and telephone.

■ We shall assume such allegations are sufficient to defeat a 12b motion, cf. Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715, 719 (S.D.N.Y.

---

3. 15 U.S.C. § 78c(a) (13) and (14) defines purchase and sale to include contracts to purchase or sell.

1968), although it is well established that one of two contracting parties has no cause of action against the other for conspiracy to breach the contract. Bereswill v. Yablon, 6 N.Y.2d 301, 306, 189 N.Y.S.2d 661, 160 N.E.2d 531 (1959); Miller v. Vanderlip, 285 N.Y. 116, 125, 33 N.E.2d 51 (1941); Savarin Corp. v. National Bank of Pakistan, 290 F.Supp. 285, 291 (S.D.N.Y.1968); Nolan v. Williamson Music, Inc., 300 F.Supp. 1311, 1320 (S.D.N.Y.1969).

The allegations of the complaint, however, will not defeat a motion for summary judgment when plaintiff is called upon to submit facts in support of its claim. With a battery of six affidavits and the assistance of prominent counsel, plaintiff has submitted not one fact that tends to show that Grace conspired with anyone, least of all Philip Morris, "in connection with" the purchase or sale of the Miller security.

Recently the court of appeals in Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), has paraphrased the purpose of Rule 10b–5 as follows: "[I]t makes it unlawful to employ fraud (including half truths) 'in connection with the purchase or sale of any securit[ies],' thus making it unlawful to employ fraud on sellers of securities as well as on purchasers," and that Rule 10(b) "extended protection only to the defrauded purchaser or seller."

Plaintiff, evidently in agreement, commences its memorandum with the statement: "This is an action for fraud in connection with the contract between the defendant W. R. Grace & Co. and the plaintiff, Pepsico, Inc.," and adds, "The defendant Philip Morris Incorporated is charged with having conspired with Grace to commit the fraud alleged."

Quite obviously the "fraud" must be "in connection with" the purchase or sale of a security. No case has been called to our attention which has sustained federal jurisdiction under 10b for a fraud committed or practiced after a purchase or sale. In A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967),

the allegations in the complaint were to the effect that *at the time* the brokers purchased the shares of stock for defendants, defendants intended to pay the purchase price only if the stock went up. In Commerce Reporting Co. v. Puretec, Inc., *supra* at 719 of 290 F.Supp., Judge, Mansfield paraphrased the complaint in that case: "the gist of plaintiffs' complaint is that the defendants *entered into the agreement* for sale of Purer's stock to plaintiffs * * * *without any intention of consummating* or closing it if they should succeed in obtaining a better deal from somebody else * * *." (Emphasis added).

In Seward v. Hammond, 8 F.R.D. 457 (D.Mass.1948), the court held that the fraud must have been practiced prior to or contemporaneously with the purchase or sale in order to come within the qualifying phrase "in connection with."

Plaintiff's affidavits in opposition to the motion contain no facts which spell out any fraud *in connection with* the "purchase" by plaintiff of the Miller stock, although they add a new obligation to the contract of May 8th and various misrepresentations of fact by J. Peter Grace to the Grace board of directors on June 5th.

Although the plaintiff's affidavits are replete with the recital of events after May 8th, not one fact is stated as to any fraud, misrepresentation or half truth before or contemporaneous with that date. There is, however, the argument that at the very least the agreement of May 8th carried with it the obligation to negotiate the terms of a definitive agreement in good faith and to execute the contract on the terms that had been agreed upon. For this argument plaintiff relies on Itek Corp. v. Chicago Aerial Industries, Inc., 248 A.2d 625 (Del. 1968). Assuming that there was a binding agreement on May 8th, we would agree that an obligation to negotiate in good faith a definitive agreement was implied but, as *Itek* held, absent such good faith, plaintiff could sue for a breach of contract.

As for the alleged false representations of J. Peter Grace to his own board of directors on June 5th, these might be the basis for a good lawsuit by Grace stockholders but of little help to plaintiff in sustaining its fraud claim. A claim under 10(b) must relate to fraud on the plaintiff. Iroquois Industries, Inc. v. Syracuse China Corp., *supra*. Plaintiff's reliance on Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964) and Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L. Ed.2d 460 (1967), is misplaced.

We have made no reference to the affidavit of Edward B. Lahey, Jr., submitted in support of plaintiff's opposition to the motion for summary judgment since we have assumed, for the sake of argument, that an issue of fact is presented as to whether or no there was a valid contract entered into between the parties on May 8, 1969. His affidavit is, nevertheless, interesting because he states that the letter agreement of May 9th was executed subject to an understanding which precluded Grace from using the letter, as they have tried to use it in their moving papers. Mr. Lahey states in substance that on May 9, 1969, George McNair, a Grace attorney, told him that on May 10, 1969, the F.T. C. would publish a new ruling requiring that companies involved in major acquisitions be required to notify the F.T.C. upon reaching agreement in principle and, therefore, suggested that since Grace and Pepsico had reached an agreement in principle that the terms of the agreement be set down in writing to show that the agreement had antedated the F.T.C. ruling, and that whatever writing was prepared would have to be carefully worded so as to make it clear that it would have no effect whatever on the transaction. He then states: "Mr. McNair assured me and we agreed with each other that any such writing would be used solely to establish to the F.T.C., if requested, that the agreement in principle had antedated the F.T.C. guidelines and for no other purpose." It seems strange that if that was the purpose of the letter there would have been a need to include in the letter the parties' intention not to be bound until a definitive agreement has been executed and delivered.

Insofar as the defendant Philip Morris Incorporated is concerned, the affidavits of plaintiff are completely devoid of any fact or reasonable implication that Philip Morris conspired with Grace in any way, shape or form. In truth, the affidavit of Joseph F. Cullman, president of Philip Morris, is not controverted in any respect. We get the impression that Philip Morris was made a party to this lawsuit out of pique because it, and not the plaintiff, bought the Miller stock.

The motion for summary judgment is granted and the complaint is dismissed for lack of jurisdiction over the subject matter. This ruling disposes of the pendent claims also. United Mine Workers of America v. Gibbs, 383 U.S. 715–726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

This is an order. No settlement is necessary.