**ARNOLD PALMER GOLF COMPANY,**
Plaintiff-Appellant,

v.

**FUQUA INDUSTRIES, INC.,**
Defendant-Appellee.

No. 75–1964.

United States Court of Appeals,
Sixth Circuit.

Argued June 23, 1976.
Decided Aug. 31, 1976.

---

Edward D. Crocker, David G. Coleman, Arter & Hadden, Cleveland, Ohio, for plaintiff-appellant.

Ellis H. McKay, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant-appellee.

Before McCREE, LIVELY and ENGEL, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from the district court's grant of summary judgment in favor of defendant Fuqua Industries, Inc. (Fuqua) in an action for breach of contract. The district court determined that a document captioned "Memorandum of Intent" and signed by both parties was not a contract because it evidenced the intent of the parties not to be contractually bound. We reverse and remand for trial.

Arnold Palmer Golf Company (Palmer) was incorporated under Ohio law in 1961, and has been primarily engaged in designing and marketing various lines of golf clubs, balls, bags, gloves, and other golf accessories. Palmer did none of its own manufacturing, but engaged other companies to produce its products. In the late 1960's, Palmer's management concluded that it was essential for future growth and profitability to acquire manufacturing facilities.

To that end, in January, 1969, Mark McCormack, Palmer's Executive Vice-President, and E. D. Kenna, Fuqua's President, met in New York City to consider a possible business relationship between the two corporations. The parties' interest in establishing a business relationship continued and they held several more meetings and discussions where the general outline of the proposed relationship was defined. In November 1969, Fuqua, with Palmer's assistance and approval, acquired Fernquest and Johnson, a Calfornia manufacturer of golf clubs. The minutes of the Fuqua Board of Directors meeting on November 3, 1969, reveal that Fuqua:

> proposed that this Corporation participate in the golf equipment industry in association with Arnold Palmer Golf Co. and Arnold Palmer Enterprises, Inc. The business would be conducted in two parts. Cne part would be composed of a corporation engaged in the manufacture and sale of golf clubs and equipment directly related to the playing of the game of golf. This Corporation would be owned to the extent of 25% by Fuqua and 75%

by the Arnold Palmer interests. Fuqua would transfer the Fernquest & Johnson business to the new corporation as Fuqua's contribution.

In November and December of 1969 further discussions and negotiations occurred and revised drafts of a memorandum of intent were distributed.

The culmination of the discussions was a six page document denominated as a Memorandum of Intent. It provided in the first paragraph that:

> This memorandum will serve to confirm the general understanding which has been reached regarding the acquisition of 25% of the stock of Arnold Palmer Golf Company ("Palmer") by Fuqua Industries, Inc. ("Fuqua") in exchange for all of the outstanding stock of Fernquest and Johnson Golf Company, Inc. ("F & J"), a wholly-owned California subsidiary of Fuqua, and money in the amount of $700,000; and for the rendition of management services by Fuqua.

The Memorandum of Intent contained detailed statements concerning, *inter alia*, the form of the combination, the manner in which the business would be conducted, the loans that Fuqua agreed to make to Palmer, and the warranties and covenants to be contained in the definitive agreement.[1]

Paragraph 10 of the Memorandum of Intent stated:

> (10) *Preparation of Definitive Agreement.* Counsel for Palmer and counsel for Fuqua will proceed as promptly as possible to prepare an agreement acceptable to Palmer and Fuqua for the proposed combination of businesses. Such agreement will contain the representations, warranties, covenants and conditions, as generally outlined in the example submitted by Fuqua to Palmer . . . .

In the last paragraph of the Memorandum of Intent, the parties indicated that:

> (11) *Conditions.* The obligations of Palmer and Fuqua shall be subject to fulfillment of the following conditions:

---

1. The entire Memorandum of Intent is contained in an Appendix to this opinion.

(i) preparation of the definitive agreement for the proposed combination in form and content satisfactory to both parties and their respective counsel;

(ii) approval of such definitive agreement by the Board of Directors of Fuqua; . . . .

The Memorandum of Intent was signed by Palmer and by the President of Fuqua. Fuqua had earlier released a statement to the press upon Palmer's signing that "Fuqua Industries, Inc., and The Arnold Palmer Golf Co. have agreed to cooperate in an enterprise that will serve the golfing industry, from the golfer to the greens keeper."

In February, 1970, the Chairman of Fuqua's Board of Directors, J. B. Fuqua, told Douglas Kenna, Fuqua's President, that he did not want to go through with the Palmer deal. Shortly thereafter Kenna informed one of Palmer's corporate officers that the transaction was terminated.

Palmer filed the complaint in this case on July 24, 1970. Nearly three and one-half years later, on January 14, 1974, the defendant filed a motion for summary judgment. More than one year after the briefs had been filed by the parties, on May 30, 1975, the district court granted defendant's motion.

The district court determined that:

The parties were not to be subject to any obligations until a definitive agreement satisfactory to the parties and their counsel had been prepared. The fact that this agreement had to be "satisfactory" implies necessarily that such an agreement might be unsatisfactory. . . . The parties by the terms they used elected not to be bound by this memorandum and the Court finds that they were not bound.

The primary issue in this case is whether the parties intended to enter into a binding agreement when they signed the Memorandum of Intent, and the primary issue in this appeal is whether the district court erred in determining this question on a motion for summary judgment. The substantive law of Ohio applies.

■ We agree with the district court that both parties must have a clear understanding of the terms of an agreement and an intention to be bound by its terms before an enforceable contract is created.[2] As Professor Corbin has observed:

The courts are quite agreed upon general principles. The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention. If their expressions convince the court that they intended to

---

2. *See, e. g., McMillen v. Willys Sales Corp.,* 118 Ohio App. 20, 193 N.E.2d 160 (1962).

Section 26 of the Restatement of Contracts states the general rule that Ohio follows:

Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions as stated in Section 25.

Comment a to Section 26 of the Restatement explains the considerations that enter into a determination whether a binding contract exists:

Parties who plan to make a final written instrument as the expression of their contract, necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then fulfilled all the requisites for the formation of a contract. On the other hand, if the preliminary agreement is incomplete, it being apparent that the determination of certain details is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract.

be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract. 1 Corbin on Contracts, § 30 (1963). [Footnote omitted.]

 The decision whether the parties intended to enter a contract must be based upon an evaluation of the circumstances surrounding the parties' discussions. The introduction of extrinsic evidence does not violate the parol evidence rule because that rule applies only after an integrated or a partially integrated agreement has been found., *Itek Corp. v. Chicago Aerial,* 248 A.2d 625 (Del. 1968), *Smith v. Dotterweich,* 200 N.Y. 299, 93 N.E. 985 (1911), 3 Corbin on Contracts, §§ 576, 577. As Judge Kalbfleisch observed in *New York Central Railroad Co. v. General Motors Corp.,* 182 F.Supp. 273, 285 (N.D.Ohio 1960):

The greatest latitude should be given in developing the surrounding situations and conditions attending the negotiations for the consummation of a contract, and the language employed in a contract should be construed in the light of circumstances surrounding the contracting parties at the time. *Circumstantial evidence is as competent to prove a contract as it is to prove a crime.* [Emphasis added.]

 At bottom, the question whether the parties intended a contract is a factual one, not a legal one, and, except in the clearest cases, the question is for the finder of fact to resolve. *See Godfrey v. Heublein,* 219 F.2d 654, 656 (2d Cir. 1955), 1 Corbin on Contracts, § 30.

We held in *S. J. Groves & Sons Co. v. Ohio Turnpike Comm'n,* 315 F.2d 235 (6th Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), also a case governed by the substantive law of Ohio, that summary judgment was inappropriate in a breach of contract case that involved "complex facts and issues." Judge Shackelford Miller, writing for the court, stated:

It is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts, what the intention of the parties was as shown by the facts, or whether an estoppel or a waiver of certain rights admitted to exist should be drawn from such facts. Under such circumstances the case is not one to be decided by the Trial Judge on a motion for summary judgment. 315 F.2d at 237–38.

The Delaware Supreme Court considered a case similar to this one in *Itek Corp. v. Chicago Aerial, supra.* Like the district court here, the trial court in *Itek* granted defendants' motion for summary judgment in a breach of contract action based upon a letter of intent. The letter of intent provided that the parties:

[S]hall make every reasonable effort to agree upon and have prepared as quickly as possible a contract providing for the foregoing purchase by Itek and sale by CAI, subject to the approval of CAI stockholders, embodying the above terms and such other terms and conditions as the parties shall agree upon. If the parties fail to agree upon and execute such a contract they shall be under *no further obligations to one another.* 248 A.2d at 627.

The trial judge decided in favor of the defendants because of the last sentence quoted above. The Delaware Supreme Court, considering the entire document and other evidence submitted by the plaintiff, reversed, determining that:

there is evidence which, if accepted by the trier of fact, would support the conclusion that . . . Itek and CAI intended to be bound . . . .. There is also evidence which, if accepted by the trier of fact, would support the conclusion that subsequently, . . . CAI willfully failed to negotiate in good faith and to make "every reasonable effort" to agree upon a formal contract, as it was required to do. 248 A.2d at 629.

In a Third Circuit opinion, *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856 (1965), the court reversed a district court's judgment in favor of defendants on a motion to dismiss

a complaint. The plaintiffs contended that they had a contract with defendants which the latter had breached. Plaintiffs relied on a telegram they sent to defendants, and defendants' subsequent acceptance, as constituting a contractual agreement. The telegram provided in pertinent part:

> My three clients are willing to sell their capital stock in said corporations for the total price of one million five hundred thousand ($1,500,000) dollars subject to formalizing a preliminary agreement along lines previously discussed. Will be in your office at 10:00 A.M. on February 15, 1960 with my clients for purpose of formalizing such an agreement. 342 F.2d at 858.

The defendants eventually notified plaintiffs that they would not sign the agreement, whereupon plaintiffs filed suit.

The reviewing court pointed out that it would be permissible for the district court to make a finding of fact that no contract existed after it had conducted a full hearing, but that where no trial had been conducted and no findings of fact had been made it was improper to grant the defendants' motion to dismiss because plaintiffs' claim, if proved, entitled them to recovery.

Considering this appeal in the light of these authorities, we determine that our proper course is to remand this case to the district court for trial because we believe that the issue of the parties' intention to be bound is a proper one for resolution by the trier of fact. Upon first blush it may appear that the Memorandum of Intent is no more than preliminary negotiation between the parties. A cursory reading of the conditions contained in paragraph 11, by themselves, may suggest that the parties did not intend to be bound by the Memorandum of Intent.

■ Nevertheless, the memorandum recited that a "general understanding [had] been reached." And, as the *Itek* court noted, the entire document and relevant circumstances surrounding its adoption must be considered in making a determination of the parties' intention.[3] In this case we find an extensive document that appears to reflect all essential terms concerning the transfer of Arnold Palmer stock to Fuqua in exchange for all outstanding stock in Fernquest and Johnson. The form of combination, the location of the principal office of Palmer, the license rights, employment contracts of Palmer personnel and the financial obligations of Fuqua are a few of the many areas covered in the Memorandum of Intent, and they are all described in unqualified terms. The Memorandum states, for instance, that "Fuqua *will* transfer all of the . . . stock," that the "principal office of Palmer *will* be moved to Atlanta," that "Palmer . . . *shall* possess an exclusive license," and that "Fuqua *agrees* to advance to Palmer up to an aggregate of $700,000 . . . ." [Emphasis added.]

■ Paragraph 10 of the Memorandum states, also in unqualified language, that counsel for the parties "will proceed as promptly as possible to prepare an agreement acceptable to [the parties] . . . ." We believe that this paragraph may be read merely to impose an obligation upon the parties to memorialize their agreement. We do not mean to suggest that this is the correct interpretation. The provision is also susceptible to an interpretation that the parties did not intend to be bound.

As we have indicated above, it is permissible to refer to extrinsic evidence to determine whether the parties intended to be bound by the Memorandum of Intent. In this regard, we observe that Fuqua circulated a press release in January 1970 that would tend to sustain Palmer's claim that the two parties intended to be bound by the Memorandum of Intent. Fuqua's statement said that the two companies "have agreed to cooperate in an enterprise that will serve the golfing industry."

---

**3.** Parties may orally or by informal memoranda, or by both, agree upon all essential terms of the contract and effectively bind themselves, if that is their intention, even though they contemplate the execution, at a later time, of a formal document to memorialize their undertaking. *Comerata v. Chaumont, Inc.*, 52 N.J. Super. 299, 145 A.2d 471 (1958).

Upon a review of the evidence submitted in connection with the motion for summary judgment, we believe that there is presented a factual issue whether the parties contractually obligated themselves to prepare a definitive agreement in accordance with the understanding of the parties contained in the Memorandum of Intent. Just as in *S. J. Groves, supra,* we believe that the parties may properly "disagree about the inferences to be drawn from [the basic facts that are not in dispute or] what the intention of the parties was as shown by the facts." 315 F.2d at 237. Because the facts and the inferences from the facts in this case indicate that the parties may have intended to be bound by the Memorandum of Intent, we hold that the district court erred in determining that no contract existed as a matter of law.

 We reject appellee's argument that summary judgment was appropriate because the obligations of the parties were subject to an express condition that was not met. We believe a question of fact is presented whether the parties intended the conditions in paragraph 11 to operate only if the definitive agreement was not in conformity with the general understanding contained in the Memorandum of Intent. *See Frank Horton & Co. v. Cook Electricity Co.,* 356 F.2d 485, 490 (7th Cir.), *cert. denied,* 384 U.S. 952, 86 S.Ct. 1572, 16 L.Ed.2d 548 (1966). The parties may well have intended that there should be no binding obligation until the definitive agreement was signed, but we regard this question as one for the fact finder to determine after a consideration of the relevant evidence.

Appellee also argues that the district court's judgment should be affirmed because, as a matter of law, Palmer cannot recover lost profits in any amount. Appellant prayed for damages in its complaint in the amount of $18,750,000. Appellee contends that because Palmer had a history of losses and because Ohio law does not permit recovery of lost profits in a new business, the district court's grant of summary judgment in favor of defendant should be upheld.[4]

We believe that this issue must abide further proofs. As appellant points out (1) it seeks damages for more than lost profits, and (2) the damages sought for lost profits relate in large part to an established business that was to be acquired by Palmer.

Accordingly, the judgment of the district court is reversed and the case is remanded for proceedings not inconsistent with this opinion.

## APPENDIX

### No. 75–1964

The Memorandum of Intent follows:

Memorandum of Intent for the Acquisition of 25% of the Stock of Arnold Palmer Golf Company in Exchange for Certain Assets of Fuqua Industries, Inc.

This memorandum will serve to confirm the general understanding which has been reached regarding the acquisition of 25% of the stock of Arnold Palmer Golf Company ("Palmer") by Fuqua Industries, Inc. ("Fuqua") in exchange for all of the outstanding stock of Fernquest and Johnson Golf Company, Inc. ("F & J"), a wholly-owned California subsidiary of Fuqua, and money in the amount of $700,000; and for the rendition of management services by Fuqua.

(1) *Form of the Combination.* Fuqua will transfer to Palmer all of the issued and outstanding stock of Fernquest & Johnson Golf Company and cash in the amount of $700,000 in exchange for an amount of common stock, $.50 par value, of Palmer ("Palmer Common Stock") equal to 25% of the total number of shares of Palmer Common Stock which will be outstanding, subject to option, or issuable upon conversion, after such issuance.

(2) *Conduct of Business.* The principal office of Palmer will be moved to Atlanta, Georgia, and the transfer of operations will occur as quickly as possible after Palmer

4. We note that the district court did not consider either the loss of profits issue or the express condition issue.

has been qualified to do business in the state of Georgia. Fuqua will provide Palmer with management services including financial, marketing, legal, industrial engineering, insurance procurement, corporate planning, data processing, purchasing and general management services at Fuqua's cost. The general operating manager of Palmer, with the title of President and Chief Operating Officer, will be nominated by Fuqua but shall be subject to the approval of the Board of Directors of Palmer and shall serve at the pleasure of such Board. Arnold Palmer, individually, shall be Chairman of the Board of Palmer, and Mark McCormack will be Vice Chairman of the Board of Palmer.

(3) *License Rights to the Use of the Name "Arnold Palmer".* Palmer and/or a wholly-owned subsidiary shall possess an exclusive license or licenses in the form attached hereto for the use of the name "Arnold Palmer" in connection with the manufacture and sale of golf clubs, golf balls, golf bags and golf gloves in the United States and Canada. The licenses are for a period expiring in the year 1991 and are exclusive licenses. Certified copies of the licenses shall be attached as exhibits to the definitive agreement for the acquisition provided for in paragraph 10 below. Palmer shall represent and warrant as to the validity, exclusiveness and duration of such licenses.

(4) *Employment Contracts.* Palmer and/or its wholly-owned subsidiary will have employment contracts with Arnold Palmer and Mark McCormack expiring in the year of 1991 in the form attached hereto. Palmer will have no other written employment contracts except an acceptable contract with Robert Robinson.

(5) *Loans and Investments by Fuqua.* Fuqua agrees to advance to Palmer up to an aggregate of $700,000, payable 150 days after demand with interest payable from time to time at the rate then charged, giving effect to compensating balances, to Fuqua by The Chase Manhattan Bank, N.A. and successor lenders, plus one quarter of

one per cent as an administrative charge, and secured by a pledge of the F & J common stock. From such funds Palmer shall cause F & J to repay to Fuqua up to the sum of $200,000 which Fuqua acknowledges will be the maximum amount owed by F & J to Fuqua. Additional funds may be advanced by Fuqua to Palmer upon such terms and conditions as the Board of Directors of Palmer and Fuqua may determine.

(6) *Investment Intent and Registration Rights.* The stock of Palmer issued to Fuqua shall be issued and received for investment and not with a view to the sale or other distribution thereof; Fuqua will execute an agreement evidencing the foregoing intent; and the certificates evidencing such shares shall be appropriately legended to express such investment intent. Fuqua will have "piggy-back" registration rights.

(7) *Palmer Qualified Stock Options.* Palmer has adopted a "Qualified Stock Option Plan" pursuant to the Internal Revenue Code of 1954, as amended. No options have been granted thereunder and all proposals to grant shares thereunder shall be canceled [EDK] [AJL]. No other options will be granted prior to the Closing.

(8) *Financial Statements.* On or before the Closing, Palmer shall submit to Fuqua financial statements as of December 31, 1969, certified by Arthur Anderson and Company, independent public accountants, including (i) a balance sheet as of that date which shall not reflect any material adverse change in the condition of Palmer since the balance sheet audited by Arthur Anderson and Company as of December 31, 1968, a copy of which has been submitted to Fuqua, except for changes incurred as a result of the operating loss incurred in the calendar year 1969, and (ii) an income statement for the year then ended which shall reveal an operating loss of not in excess of $200,000. Fuqua has already delivered to Palmer a copy of the acquisition agreement pursuant to which Fuqua acquired F & J, including financial statements attached thereto as exhibits, and shall represent and warrant that there has not been any material adverse

change in the condition of F & J and its wholly-owned subsidiary as set forth in said acquisition agreement since the date thereof.

(9) *Representations, Warranties, Conditions and Covenants.* The definitive agreement provided for in paragraph 10 below for the combination of the businesses shall contain representations, warranties, conditions, and covenants in the general form used by Fuqua in connection with the acquisition of businesses by Fuqua. Fuqua has delivered to Palmer an example of such provisions.

In addition, such agreement will provide that the following shall be conditions to the obligations of Fuqua thereunder:

(a) Professional Golf Company ("Pro Golf") will advise Palmer in writing that its requirements contract with Palmer dated October 27, 1961, does not obligate Palmer to purchase future requirements from Pro Golf.

(b) There will be no obligation on the part of Palmer to continue under any lease from Pro Golf to Palmer.

(c) Termination of requirements contract with Windbreaker-Danville Company, dated January 20, 1962.

(d) The life insurance policies on the lives of Arnold Palmer and Mark McCormack will be assets of Palmer.

(e) There will be a warranty by Arnold Palmer that he has no present obligation to Wilson Sporting Goods Co.

(f) Palmer will have the written authority to disapprove any proposed future "premium sales" of golf clubs, golf balls, golf bags and golf gloves arranged by Arnold Palmer Enterprises, Inc. in the territories in which Palmer and/or its subsidiary are licensed to sell such products.

(g) Remlap Company shall be a wholly-owned subsidiary of Palmer.

(h) Palmer will warrant that there is no present obligation to pay royalties to Jack Harkins on the sale of golf balls and that there will not be in the future unless steel center golf balls are sold.

(10) *Preparation of Definitive Agreement.* Counsel for Palmer and counsel for Fuqua will proceed as promptly as possible to prepare an agreement acceptable to Palmer and Fuqua for the proposed combination of businesses. Such agreement will contain the representations, warranties, covenants and conditions, as generally outlined in the example submitted by Fuqua to Palmer and referred to in paragraph 9 hereof. In addition, the definitive agreement will provide for indemnification of Fuqua by the principal stockholders of Palmer (Arnold Palmer, Robert Caldwell, Mark McCormack and Hardwick Caldwell) [EDK] [AJL] for a period of three years after the closing in the event that Palmer shall have undisclosed liabilities in excess of $100,000, pursuant to which said principal stockholders will be obligated to indemnify Fuqua in an amount equal to only 25% of so much, if any, of such undisclosed liabilities as are in excess of $100,000 and shall as a group in no event be obligated to make payments in excess of a total of $1,000,000 for all four stockholders combined [EDK] [AJL].

(11) *Conditions.* The obligations of Palmer and Fuqua shall be subject to fulfillment of the following conditions:

(i) preparation of the definitive agreement for the proposed combination in form and content satisfactory to both parties and their respective counsel;

(ii) approval of such definitive agreement by the Board of Directors of Fuqua;

(iii) approval of such definitive agreement by the Board of Directors of Palmer;

(iv) approval by the stockholders of Palmer of certain amendments to the Articles & Regulations of Palmer which are necessary in order to consummate said agreement;

(v) approval by the respective counsel of Palmer and Fuqua of all legal matters;

(vi) that between the date of the definitive agreement and the Closing, there shall have been no material adverse change in the business or financial condition of Palmer or F & J;

(vii) requisite approval by creditors of Palmer and Fuqua;

(viii) the Closing shall have occurred not later than March 31, 1970.

(12) *Publicity.* All announcements and publicity relating to the proposed combination shall be subject to the mutual approval of Palmer and Fuqua.

The foregoing correctly setting forth the general understanding and agreement of the respective parties, and parties hereby confirm their acceptance by signing and delivering copies of this memorandum, as of this _____ day of December, 1969.

ARNOLD PALMER GOLF
COMPANY
By/s/ Arthur J. Lafave, Jr.
*President's Designee*

FUQUA INDUSTRIES, INC.
By/s/ E. D. Kenna
*President*