**RAND–WHITNEY PACKAGING CORP., Plaintiff,**

**v.**

**The ROBERTSON GROUP, INC., Robertson Paper Box Co., Inc. and Simkins Industries, Inc., Defendants.**

**Civ. A. No. 86–1393–W.**

United States District Court,
D. Massachusetts.

July 31, 1986.

Judgment by Consent Sept. 4, 1986.

---

James Delphy, Daniel L. Goldberg, Bingham, Dana & Gould, Boston, Mass., for plaintiff.

Frank Bailey, David Cavers, Jr., Richard Mable, Robert Witolmes, Jr., Powers and Hall, Boston, Mass., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOLF, District Judge.

This is a case which, as you know, started on May 5th, 1986. And on May 6th, 1986, I entered a temporary restraining order precluding the Defendant from transferring the assets at issue in this case.

We had, as I said when I saw you last week, an expedited trial because I was concerned that the pendency of a temporary restraining order and a possible preliminary injunction would hold the Defendant hostage to running a business that, at least at the outset of the case, was losing money. I understand it has since been realized that it has been earning money at least in some months.

I was also influenced in giving an expedited trial by the fact that if the Plaintiff prevailed and persuaded the Court that specific performance was appropriate, it would be important that the Plaintiff acquire the company it intended to purchase. It was recognized that the passage of several years through trial in the ordinary course could radically alter the nature or value of the assets at issue.

It is those same considerations that have caused me to have you here today so I could give you my decision in this form. I have decided that the April 18, 1986 letter constitutes a contract, that is a binding agreement between Rand-Whitney and Robertson Group Inc., to sell the assets of the Robertson Paper Box Company.

I've also decided that specific performance is at least part of the appropriate remedy. These two decisions raise issues regarding the careful fashioning of a remedy which Mr. Cavers, in his closing argument, asked for an opportunity to address further should we reach this point.

The most prominent of those questions is whether specific performance ought to be ordered on the basis of the April 18, 1986 letter alone or on what you'll recognize when I call it "Exhibit G," that is the April 18 letter integrated with the purchase and sale agreement drafted by Powers & Hall which is an exhibit in the case.

Rather than take the time to write an opinion, and have it go through the numerous drafts that such opinions often do, since I very carefully considered this case since I saw you last, and had very recent and intensive exposure to it, I've decided to inform you of the reasons for my decision, my findings of fact and conclusions of law,

today subject to my reservation of rights to read the transcript, to edit and clarify the findings of fact, and to edit and elaborate the conclusions of law. I may not mention all of the authority I now believe exists for the conclusions of law which I'll inform you of.

Basically, this has been a case where there has been a very energetic and effective presentation by counsel. It has been very illuminating to me. In reviewing the very detailed notes I have of the testimony, I feel I can appropriately render this decision in this form. I will do so.

The findings of fact in this case are as follows. Having considered all of the evidence and having made judgments regarding credibility in the areas where that was necessary and appropriate (I might say few, if any, of those areas related to the testimony of Mr. Grieb which you ultimately agreed, and I agree, could properly be taken through deposition.) I find that the Plaintiff has proven the following facts by a preponderance of the credible evidence.

First, with regard to the parties, the Rand-Whitney Packaging Corporation is a Massachusetts corporation with its usual place of business in Leominster, Massachusetts. It makes paper and packaging materials. It also has facilities in Worcester, Massachusetts, Rhode Island, New Hampshire and Delaware. It does not own a board mill. Rather, it buys its paper products from others. The Robertson Group Inc. is a Delaware Corporation with its usual place of business in Connecticut. It owns 100 percent of the Robertson Paper Box Company which is also a corporation with its principal place of business in Connecticut. Robertson Paper Box Company is in business of manufacturing paper and packaging materials. It does own a board mill, and it produces a product which Robertson Paper Box uses and which Rand-Whitney could use.

The Boards of Directors of the Robertson Group Inc. and Robertson Paper Box usually hold simultaneous Board of Directors meetings. They did so on April 17, 1986, a key date in this case. As a practical matter, the Robertson Group Inc. and its directors are an alter ego for the Robertson Paper Box Company and its directors. When I use the term "Robertson" in this decision, I am referring both to Robertson Group Inc. and to Robertson Paper Box unless I indicate otherwise.

In April 1985, the Robertson companies were substantially owned by the Powers family, and Richard Powers controlled the majority of voting stock. At that time, Mr. Powers was replaced as the Chairman and Chief Executive Officer of Robertson by J. Richard Grieb. That occurred, in part, as the result of a family dispute relating to the business. Mr. Grieb was the former President of Smirnoff Beverages, and former president of Heinz U.S.A., and held other high level executive positions.

At about this time the Board of Robertson began discussing selling Robertson Paper Box. In this period Robertson Paper Box was losing about a $125,000 a month. These monthly losses continued until April 1986 when it now appears that Robertson earned a profit. The discussion of selling Robertson Paper Box was influenced by the family disputes, and also influenced by the fact that Robertson did not have the capital to invest in the box company to make it competitive and profitable.

A committee of Robertson was set up to explore the possibility of selling the box company. The committee consisted of Mr. Grieb, Mr. Tracy, the Robertson's engagement partner at Arthur Anderson, and Mr. Morrison, an outside director of a firm. The committee, at least in that period, was hoping that it could get book value, or the amount of shareholder equity, for the company. They considered that to be a figure in the range of 2.8 to 3.5 million at that time. They also expected that they might have to take a discount on shareholder equity in order to sell the company.

By January of 1986, when the Robertson Board met, there were no live prospects for the purchase of the company. There was, however, then a definite consensus on the Board to sell the company if a purchaser could be found by April. In addition, the

Board determined that if there was no purchaser by April 1986, strong consideration would have to be given to closing Robertson Paper Box and liquidating the company. This was recognized as an unattractive alternative because of the impact it would have on Robertson's employees, and also the adverse impact that it would have financially on shareholders. Mr. Grieb was given the responsibility to deal with the potential buyers.

In February of 1986, Rand-Whitney learned that Robertson was for sale. Nicholas Willard, the Vice President and General Manager of Rand-Whitney, was placed in charge of exploring possible acquisitions. Mr. Willard contacted Mr. Grieb and arranged for himself and Mr. Petro of Rand-Whitney to visit Robertson in February, 1986.

At that time, the Rand-Whitney representatives toured the Robertson plant and mill. They discussed their potential interest in buying all of the real estate owned by Robertson Paper Box, consisting of about 73 acres in addition to the property at which the operating assets were located. They received a list of major equipment from Mr. Grieb. They also discussed what kind of capital investment would be needed to make the improvements desirable to enhance the competitiveness and efficiency of Robertson. This included contemplated investments of about 1.5 million for the plant and $500,000 for the mill.

Mr. Willard was immediately interested and engaged by the prospect of Rand-Whitney acquiring Robertson. The mill promised an opportunity to gain a degree of vertical integration otherwise unavailable. The mill had potential to furnish supplies to Rand-Whitney facilities in Massachusetts, Rhode Island, and Delaware. The central Connecticut location of Robertson would place Rand-Whitney faclities closer to its New York sales office. Robertson had a good reputation in the industry and some useful equipment. It also provided a good location for the trucking operations of Rand-Whitney. In addition, the mill would provide a good fit with Rand-Whitney's affiliate, International Forest Products, which could use the mill's paper scraps in its recycling operations.

From mid-February to April 8, 1986, Mr. Willard and Mr. Grieb were in frequent contact. Rand-Whitney was investigating the desirability of purchasing Robertson if it could. In connection with this, Mr. Grieb gave Mr. Willard all the information which Mr. Willard requested. This included customer information, financial information, and other information. In addition, Rand-Whitney had several experts go to the plant and mill in order to evaluate and report on the quality of the plant, the equipment, and other items.

In this period, Mr. Grieb told Mr. Willard that the selling price for Robertson would be an amount equal to book value or shareholder equity, which he expected in dollar terms would translate into three to three-and-a-half million dollars. Mr. Grieb also told Mr. Willard that there were others who were interested in the possible Robertson acquisition. In this period Rand-Whitney decided that it was definitely interested in attempting to purchase Robertson. Thus, Mr. Willard asked Mr. Grieb to develop a proposal for the sale of Robertson to Rand-Whitney in a form which would be agreeable to the Robertson Board and shareholders, to the extent that shareholder approval was necessary. I do not find that issue was discussed in that period. Basically, Mr. Willard asked Mr. Grieb to develop a proposal for the sale of Robertson to Rand-Whitney in terms that were likely to be acceptable to Robertson.

This led to a meeting on April 8, 1986 in Worcester, Massachusetts between Mr. Grieb and several representatives of Rand-Whitney. At that point, Mr. Grieb told the Rand-Whitney representatives that Robertson wanted a stock deal, a transaction in which Robertson would sell its stock to the acquiring entity. Rand-Whitney, at that point, preferred an asset transaction, but was also agreeable to a stock deal.

Mr. Grieb discussed with the Rand-Whitney representatives six possible proposals for structuring an acquisition by Rand-

Whitney. Those proposals are reflected on Exhibit 15 in this case. Mr. Grieb recommended one of those proposals, the sixth, as the best balance which would give Rand-Whitney sufficient capital to make the necessary capital investments in the early years, but also give the Robertson shareholders the money it wanted and needed to agree to make the sale. In essence, it struck a balance between the amount that would be paid up front and the amount that would be paid by promissory notes. The total payment was intended to be, according to that proposal, about $1.5 million cash up front with a balance payable, and the debt evidenced, by a promissory note.

Mr. Grieb explained to the Rand-Whitney representatives that there was urgency to proceeding in part because Mrs. Powers, an older woman, might pass away, causing some dispersion of control of the company and making it harder to effectuate a sale.

There were certain specific items discussed on April eighth. Rand-Whitney made it clear to Mr. Grieb that it was interested in acquiring all of the real estate owned by the Robertson Paper Box Company. Mr. Grieb agreed to this suggestion. In addition, Mr. Grieb in discussing the inventory explained that it was all, in his words, "clean inventory"; that is that none of it was likely to be obsolete because all was prepared in response to a specific purchase order.

With regard to the accounts receivable, Mr. Grieb represented that all had historically been collectable. He also stated that there were no environmental problems associated with the mill.

At the April 8 meeting for part of the time was the President of Rand-Whitney, Robert Kraft. Mr. Kraft explained to Mr. Grieb that from Rand-Whitney's perspective, it was important that if a deal was to be made, it be made promptly. Mr. Kraft explained that he definitely did not wish to make a serious offer, and have Robertson, in his words, "shop that offer," that is use it as a basis for negotiations to get a higher price from others.

Mr. Kraft explained that he had recently had that sort of unfortunate and unfavorable experience in attempting to acquire a sports team. He did not wish to experience that again. Mr. Kraft also said that there was urgency to having a quick decision as to whether Robertson would be sold to Rand-Whitney because Rand-Whitney had an opportunity to acquire two plants on the West Coast of the United States. He explained that Rand-Whitney's management structure would not permit it to pursue both the Robertson acquisition and the West Coast acquisitions at the same time, and Rand-Whitney would have to make a decision soon as to which way to go.

At this point, Mr. Grieb felt, and expressed the view, that Rand-Whitney would be a very good fit for Robertson. Like Robertson, Rand-Whitney was a family business. Rand-Whitney had the money necessary to invest in Robertson to enhance its competitiveness and profitability. It also provided a vehicle for continuing employment of management and other employees of Robertson.

Mr. Grieb explained to the Rand-Whitney representatives on April eighth that in view of the circumstances, it was important that Rand-Whitney make its best offer, that is the maximum offer that it was willing to make, and not make its initial offer merely a negotiating position. He also recommended that Rand-Whitney put a time limit on its offer. He said that the Board of Robertson would meet on April 17 with a view to choosing the best offer it then had. He also said that a substantial majority of the shareholders of Robertson were represented on the Board, so Board approval would be tantamount to shareholder approval. He said that a Board vote on April 17 would give Mr. Kraft the assurance he wanted regarding a reliable deal for the acquisition of Robertson.

On April 8, Mr. Grieb and Robertson also wanted action urgently. The Robertson Paper Box Company was continuing to lose money in the range of about $125,000 a month. Morale was bad and key employees were leaving. In addition, the Powers

family was pressing for a sale. As Mr. Grieb said, at one point, they had an interest in "cashing out."

Between April 8 and April 17, Mr. Grieb and Mr. Willard spoke frequently by telephone. Mr. Grieb learned that Rand-Whitney would be making an offer along the lines of his Proposal 6. There was some discussion in this period about the union wage reopener. Mr. Grieb kept Richard Powers and some other directors of Robertson informed of developments in this period.

On April 14, the committee composed of Messrs. Grieb, Tracy, and Morrison met to discuss the three offers then in hand in anticipation of the April 17 Board meeting. At that point, the Simkins Company had orally offered to pay 1.6 million dollars for Robertson's. Rexham had offered about 1.4 million. Rand-Whitney was expected to imminently offer about 2.85 million for Robertson. The committee decided that Rand-Whitney's was clearly the best offer, and they would recommend that the Board approve and accept that offer.

At that meeting they also discussed the alternative of liquidating the company. They recognized that liquidation would probably leave Rand-Whitney with about $1,250,000 less than they anticipated receiving from Rand-Whitney.

The members of the committee, at that point, all hoped to be able to do a deal with Rand-Whitney. In effect, Rand-Whitney had offered just what they were looking for, but had not found in the past year.

On April 15, 1986, Mr. Willard called Mr. Grieb and read to him a covering letter and an offering letter that he then intended to deliver promptly to Robertson. Mr. Willard called that offering letter, which is Exhibit 19 in this case a, "letter of intent."

The letter followed the format of Proposal 6 which Mr. Grieb had introduced to Rand-Whitney on April 8. It called for a purchase at book value of the stock of Robertson, which is the price which Mr. Grieb and his colleagues had been hoping for. There were, however, some modifica-

tions. The interest rate on the notes would be reduced to 9 percent, and there would be a longer pay out period in connection with the notes.

Mr. Grieb, at this point, engaged in some negotiations with Mr. Willard, successfully seeking an additional $50,000 in the purchase price and an additional $350,000 cash up front. Mr. Willard agreed, modified his letters accordingly, and those letters were delivered to Robertson.

The cover letter, which is Exhibit 18, and the offering letter, Exhibit 19, each dated April 15, 1986, reiterated the urgency of the situation from Rand-Whitney's perspective. The letters each indicated that the offer would expire on April 19. In the cover letter, Mr. Willard explained again that Robertson had potential West Coast acquisition opportunities which it had to decide promptly whether to pursue. That was the reason, or part of the reason, for the April 19, 1986 termination date. In addition, the offer reflected in Exhibit 19 contemplated that Rand-Whitney would take some operating authority of Robertson on about May 4, 1986, when by the terms of that offer it would begin to assume responsibility for any continuing losses.

On April 16, 1986, Mr. Grieb was told for the first time that an asset sale would be much more favorable to Robertson and its shareholders than a stock sale. As it turns out, certain refinancings at Robertson had caused the stock to have a low, perhaps negative, basis. Accordingly, a stock sale would result in a substantial capital gain.

On the other hand, it was explained to Mr. Grieb that an asset sale of specified assets would leave Robertson and its shareholders with the box company's net operating losses, which they could put to good financial use. Conversely, Rand-Whitney in an asset sale would not get the financial benefit of the net operating losses. Mr. Grieb called Mr. Willard to explain this change in the desired nature of the sale. Mr. Willard indicated that Rand-Whitney would be agreeable to making an asset rather than stock acquisition. Both parties

explicitly recognized, however, that an asset deal would require a renegotiation and reduction in the purchase price to reflect the value of the lost net operating loss to Rand-Whitney.

On April 17, there were a series of meetings at Robertson. The Board meeting had been deferred for several weeks to allow Mr. Grieb to make maximum progress in developing an offer or offers for the company. Prior to the Board meeting, Mr. Grieb, Mr. Morrison, and Mr. Tracy met again to discuss with Mr. Bailey, an attorney and member of the Board, the asset rather than stock sale. The participants in that meeting agreed once again to recommend Rand-Whitney as the purchaser for Robertson on an asset rather than a stock basis, and recognized that this would require a reduction in the selling price.

The Robertson Board then met. In the course of that meeting, Mr. Grieb discussed his efforts to sell the company. Among other things, he said that liquidation of the company would cost Robertson, out of pocket, about $750,000, and liquidation would be bad for the employees who would lose their jobs, and, of course, for the shareholders. He explained that there was an offer from Rexham with a value of about 1.4 million and an oral offer from Simkins of about 1.6 million.

He then went on to address the Rand-Whitney offer. He explained the offer reflected in the letters, which he distributed, would provide about $2,850,000 in exchange for the stock of Robertson Paper Box. He said he perceived Rand-Whitney as a good fit. Rand-Whitney, like Robertson, was a family business. It would continue employment for many of the employees. He explained that Rand-Whitney wanted all of the land owned by Robertson Paper Box. He told the Board that the Rand-Whitney offer was the best offer, but it would have to be restructured as an asset deal.

Most of the discussion relating to the Rand-Whitney offer related to the issue of restructuring. The Board discussed the need to reduce the price for the loss to Rand-Whitney of the net operating loss. A $400,000 maximum discount, that is reduction as compared to the stock purchase price, was discussed.

Richard Powers who, as I said, then controlled the majority of the voting stock, individually and in his capacity as a trustee of a voting trust, made a resolution. That resolution proposed to authorize Mr. Grieb to enter into an asset agreement with Rand-Whitney for a price equal in value to $2,850,000 for the stock. Mr. Grieb would be authorized to discount the price by $400,000 to recognize the loss to Rand-Whitney of the net operating loss, and also a possible investment tax credit, if an asset rather than a stock transaction was pursued.

This resolution was discussed. One of the directors, Mr. Hinderman, asked whether shareholder approval would be required for an asset transaction, as it would be for a stock transaction. He was told that it would not. Mr. Humphreyville, another director, expressed some dissent, wanting to explore the possibility of selling to another company. Mr. Morrison responded by emphasizing the urgency to Robertson of proceeding if the Rand-Whitney possibility was not to be lost. The Rand-Whitney deadline on its offer was April 19, and Rand-Whitney's West Coast possibilities were also discussed. They were reflected in the cover letter, Exhibit 18, and the offer letter, Exhibit 19, which were distributed to the Board.

On April 17, the Robertson Board knew of Rand-Whitney's West Coast opportunities and knew that Rand-Whitney would rely on any approval it gave and forgo pursuing those West Coast opportunities.

The Board voted on Mr. Powers' resolution concerning authorization. Only Mr. Humphreyville dissented. According to Mr. LaCour's notes, which are Exhibit 100, even in dissenting Mr. Humphreyville said that he recognized the urgency of Robertson going ahead promptly with Rand-Whitney.

I find that the resolution which was adopted by the Board of Robertson on April 17, 1986 is as stated in the minutes of that Board meeting, which are Exhibit 20 in this case. Specifically, the resolution adopted said "resolved that J. Richard Grieb is authorized to renegotiate an agreement with Rand-Whitney that will consummate an asset purchase of Robertson Paper Box Company Inc. by Rand-Whitney equal to $2,850,000 in stock purchase. He is also authorized to discount that price by $400,000 to recognize the loss to Rand-Whitney of the NOL and the ITC based on the changed transaction base."

I further find that by this resolution Mr. Grieb was authorized to enter into a binding contract with Rand-Whitney within the parameters of an asset deal and with a $400,000 discount over the contemplated stock purchase price. Mr. Grieb, at that point, understood that he was authorized to enter into a binding agreement. He drafted the resolution using the word "agreement" himself. His testimony in volume 3 of his deposition, at the bottom of page 91 and going on to page 92, is one of many things consistent with this conclusion.

On April 17th the directors knew that no shareholder approval was required. In addition, they did not contemplate any further Board action or approval. On April 17, 1986, the Board did not discuss and did not intend, that the letter Grieb would negotiate and sign with Rand-Whitney would not be binding.

There was testimony in the case, some by Mr. LaCour, some by Mr. Tracy, some by Mr. Powers, to the effect that on April 17 it was said that the renegotiated letter would not be binding. I do not find that testimony to be credible or correct. At best, the witnesses were confusing the discussion on April 30, 1986, which I will address, with the discussion at the April 17, 1986 meeting. At worst, the testimony was contrived. In any event, I do not find that testimony to be credible or correct.

After he was authorized to proceed, Mr. Grieb said that he would meet promptly with Rand-Whitney representatives. Mr.

Bailey, the attorney from Powers & Hall who was also a member of the Board, said that a purchase and sale agreement would be required. The Board then passed the resolution reflected on the bottom of page 4 of the April 17, 1986 minutes, that is Exhibit 20, which authorized the retention of Powers & Hall to work on the P & S, among other things, that might be necessary to conclude the sale of Robertson Paper Box, and urged that Powers & Hall minimize its legal fees in view of the scant availability of funds which Robertson then had.

At the end of the directors' meeting the directors of Robertson were very pleased. Mr. Powers warmly congratulated Mr. Grieb. Mr. Morrison, however, in effect warned the directors not to count their chickens before they hatched. He indicated that things could go wrong, and that there were still major items to be negotiated. I note that on April 17, one of those items was the purchase price. I find that at the end of the meeting on April 17, 1986 the Board of Directors had authorized Mr. Grieb to enter into a binding contract with Rand-Whitney within certain parameters. Mr. Grieb understood this. No further corporate action was contemplated. In addition, the directors of Robertson had an urgent desire to enter into a binding agreement with Rand-Whitney because they then believed the company was still losing money at the rate of about $125,000 a month.

Following the Board meeting on April 17, Mr. Grieb called Mr. Willard. Mr. Grieb said that he had approval for a deal with Rand-Whitney. He said that the parties would have to restructure the deal as an asset deal. He also said that he had "carte blanche" to work it out.

Mr. Willard and Mr. Grieb arranged to meet the next day. Mr. Grieb then met with Mr. Tracy and Mr. Bailey. Mr. Tracy told Mr. Grieb that the fastest way to convert the transaction from a stock deal to an asset deal would be to remove the intercompany receivables from the assets to be sold. He prepared and gave Mr. Grieb a list of assets to be sold which

included all of the assets of the Robertson Paper Box Company except the intercompany receivables. This document is captioned "Robertson Paper Box Company, Statement of Net Assets to be Sold," and is Exhibit 44 in this case.

Mr. Bailey and Mr. Grieb then discussed the terms of the contemplated letter. Mr. Bailey suggested to Mr. Grieb that two changes in the letter would be desirable, in addition to those necessary to convert the deal from a stock deal to an asset deal. With regard to paragraph 3(c) of the April 15, 1986, letter, Mr. Bailey suggested that Mr. Grieb seek to have the condition requested by Rand-Whitney that the deal be subject to execution of satisfactory employment agreements with certain key employees of Robertson changed to a condition which would provide only that reasonable efforts would be made to obtain such agreements. Mr. Bailey was motivated by a desire not to permit the failure to obtain agreements with certain key employees to be a loophole which would allow Rand-Whitney to escape if it changed its mind about acquiring Robertson.

In addition, Mr. Bailey asked Mr. Grieb to try to get the last line of the letter modified to provide that the letter constituted the statement of the current intent of both parties subject to the execution of the purchase and sale agreement. I find that this suggested change was intended to introduce, or clearly reflect, the concept of mutuality with regard to the purchase and sale agreement. It was an effort to assure that the terms of the purchase and sale agreement have to be agreeable not only to Rand-Whitney, but also to Robertson. Paragraph 3(b) of the April 15 letter contemplated a purchase and sale agreement satisfactory to Rand-Whitney. The proposed change in the final paragraph was intended to provide mutuality to that obligation.

On April 18, 1986, Mr. Grieb met with principals and attorneys for Rand-Whitney in Massachusetts. He began the meeting by congratulating Rand-Whitney in passing out certain small gifts. He told the Rand-Whitney representatives that the Board of Robertson had approved the transaction with Rand-Whitney. In response to a question from Mr. Karelitz of Rand-Whitney, Mr. Grieb said that the Board had passed a resolution authorizing him to finalize a deal with Rand-Whitney. He said he was authorized to finalize an asset deal within certain parameters. He also said that he would give Rand-Whitney a copy of that resolution when it was typed up.

In response to another question from one of the other Rand-Whitney representatives, Mr. Grieb said that he was comfortable being there alone among the many Rand-Whitney representatives and attorneys. He said that he had considerable experience with acquisitions and divestitures.

The participants then proceeded to discuss the conversion of the initially proposed stock transaction to an asset deal. Mr. Grieb distributed Exhibit 44, the statement of net assets to be sold. When that document is read in conjunction with the balance sheets of Robertson, such as Exhibits 54 and 90, the description of net assets to be sold, which is Exhibit 44, describes quite specifically all of the balance sheet assets which are involved in this transaction. They are, in effect, all of the assets except for the intercompany receivables.

The majority of the discussion about converting to an asset deal involved in the negotiation of how much of a price discount would be given for the loss of the net operating loss to Rand-Whitney. The figure ultimately agreed upon was a reduction of $400,000, which, unknown to Rand-Whitney, was the maximum of Mr. Grieb's authority. There were also other changes discussed largely at Mr. Grieb's initiative with regard to the April 15 letter, which Mr. Grieb had with him.

With regard to the subject of due diligence, which was in paragraph 3 of the April 15 letter and emerged in paragraph 4 of the April 18 agreement, Mr. Grieb said if any problems popped up during due diligence, they would be fixed.

With regard to condition 3(c) of the April 15 letter which was addressed in paragraph 5 of the April 18 agreement, Mr. Grieb addressed the issue of the key employees' employment contracts. He explained that the April 15 letter made the deal conditional on Rand-Whitney executing employment contracts with key employees. Mr. Grieb wanted to make sure this was not a deal breaker. He did not want a loophole for Rand-Whitney to escape from its obligation to buy Robertson. Thus, as Mr. Bailey had suggested, he asked that this be changed to a reasonable efforts provision. Rand-Whitney agreed. I find that on April 18, 1986, Mr. Grieb was animated by the desire to bind Rand-Whitney to the maximum extent possible when he focused on this provision.

With regard to the closing date, the issue addressed in paragraph 8 of the April 18 agreement, Mr. Grieb indicated that he wanted the closing as soon as possible. I find he was then motivated by his understanding that Robertson was losing money. Accordingly, Mr. Grieb urged, and Rand-Whitney accepted, a June 30, 1986 closing date.

With regard to the final paragraph of what became of the April 18, 1986 agreement, that is Exhibit 28, which will be appended as Exhibit A to this opinion, Mr. Grieb wanted the offer of Rand-Whitney extended to April 21 because he said he wanted to consult someone, who it turns out was Mr. Tracy, before signing the letter and he was not sure that he would be able to reach that person that day.

With regard to the last line of Exhibit 20, Mr. Grieb told Mr. Karelitz, after many of the others had left, that Robertson wanted the last line of the letter to incorporate the concept of mutuality. As I said earlier, the April 15 letter in paragraph 4 had made the deal conditional on a purchase and sale agreement satisfactory to Rand-Whitney. To address this in the manner requested by Mr. Bailey, Mr. Grieb asked that the letter be made a statement of the intent of the parties subject to the execution of a purchase and sale. The purchase and sale would have to be satisfactory to Robertson as well as to Rand-Whitney. In response to this, Mr. Karelitz wrote, "This letter shall constitute the mutual intent of both parties to enter into a definitive asset purchase agreement to consummate the transactions described herein." He read this language to Mr. Grieb. Mr. Grieb agreed that the language was satisfactory, and addressed the point he had been raising. Subsequently, one of Rand-Whitney's lawyers modified and clarified that language a bit to use the words "mutual intention of both parties."

Mr. Grieb did not ask that the letter provide that it was not a binding commitment. His lawyers did not ask him to include such a provision. Statements that a letter of this sort is not binding are often found in such letters when it is the intent of the parties that they not be binding. Mr. Wyman, the Defendant's expert, for example, said it is his custom to include such an express provision when it is his intention that a letter of this sort not be binding.

The lawyers worked on revising the April 15 letter over lunch. It was discussed by Mr. Grieb and the representatives of Rand-Whitney after lunch.

With regard to paragraph 3 of Exhibit 20, Mr. Grieb agreed that Robertson would buy back any unpaid accounts receivable and obsolete or unsaleable inventory at some appropriate time or times. He indicated that the dates were likely to be different. He did not agree to the dates for triggering the buy back or buy backs suggested by Rand-Whitney. The issue of the obsolete inventory and uncollectable accounts receivable are insignificant items, as Mr. Sanagra's testimony made clear. Consistent with this understanding, Mr. Grieb and Rand-Whitney's representatives agreed that the dates for the buy backs could be agreed upon in connection with the development of the purchase and sale agreement.

Following the discussion, another revision of the document was done. Mr. Grieb called and reached Mr. Tracy, discussed the document, and consulted him on the ques-

tions which he had been concerned would preclude him from signing the letter that day.

After speaking to Tracey, Grieb told the Rand-Whitney representatives that he was satisfied with the letter, and he signed it on behalf of the Robertson Group Inc. Mr. Willard signed the letter on behalf of Rand-Whitney. In signing the letter, Mr. Grieb did not say that Robertson Board or the shareholder approval was needed. It was not.

At this point, Mr. Willard mistakenly believed that shareholder approval of Robertson would be needed for this asset deal, as it would have been needed for the stock acquisition that was discussed earlier. Based on Mr. Grieb's prior explicit representations, however, Mr. Willard believed that shareholder approval was a technical, inevitable formality because, among other things, the controlling shareholders of Robertson had approved the sale to Rand-Whitney at the Board meeting the day before. In any event, Mr. Willard did not communicate his mistaken belief to Mr. Grieb or, at that time, to anybody else.

I find that when the letter was signed, each party, that is Robertson and Rand-Whitney, intended to be bound by the letter and intended to proceed in good faith to develop and sign a purchase and sale agreement which would permit them to consummate the transaction to which they had just agreed. Each side then recognized that there were limited contingencies which might occur which could cause them to cease to be bound by the letter agreement. Due diligence was the most important of these. The prospect that a mutually satisfactory purchase and sale agreement would not be developed was another.

I also find that each side immediately acted as if they were contractually bound. I further find that the letter contained, as I will describe later, all of the essential terms necessary to constitute an enforceable agreement and to allow specific performance. At this point, in deference to the court reporter, we will take about a five- or ten-minute break and resume.

THE CLERK: All rise for the Honorable Court.

(Recess taken.)

THE CLERK: Court is in session.

THE COURT: Before proceeding with the findings, as they relate to matters after April 18, I'd like to go back and clarify something that may not have been accurate and complete with regard to the findings concerning the April 17 Board meeting.

As I intended to convey earlier, I have found that after Mr. Grieb was authorized by resolution to enter into an agreement with Rand-Whitney, Mr. Bailey discussed what would be required to consummate the transaction, and indicated that a purchase and sale agreement, among other things, would be required. It was at this point that he made the comment in some form of words reflected in Mr. LaCour's notes, Exhibit 100, that there would be no deal until there was a purchase and sale agreement. This was in the context of the resolution authorizing the retention of Powers & Hall. It was not in the context of the resolution authorizing Mr. Grieb to reach an agreement with Rand-Whitney.

Now, returning to the period after April 18th, I find that Rand-Whitney immediately and consistently acted as if the letter of April 18 was a binding agreement. Within days, it prepared an announcement of the acquisition of Robertson which was posted in Rand-Whitney's plant. In addition, in the same period, it accelerated the order of computer equipment which would be necessary to integrate Robertson with Rand-Whitney.

Finally, Rand-Whitney declined to pursue the possible West Coast acquisitions, which it might have otherwise pursued, because it did not have the manpower adequate to do both deals. With regard to the West Coast acquisitions, Rand-Whitney reasonably relied to its detriment on Mr. Grieb's representations on behalf of Robertson. Mr. Grieb and Robertson knew that Rand-Whitney would so rely.

I find that in the period shortly after April 18, 1986, Robertson also acted as if the letter of April 18 was a binding agreement. Within days, Mr. Powers called Mr. Kraft. He congratulated him. He also offered his services as a consultant.

Mr. Grieb did a number of things which indicated his understanding that the letter was binding. He advised Rexham that its offer was not accepted. On about April 22, 1986, he received Mr. Simkins' telegram raising the Simkins offer to 3.5 million dollars. That was at least $500,000 more than the Rand-Whitney purchase price. On about April 22, Mr. Grieb spoke to Mr. Simkins. He told Mr. Simkins that Robertson had made a commitment to Rand-Whitney. That is reflected on Exhibit 30, the note which Mr. Grieb made on the Simkins telegram which he eventually sent Mr. Kraft.

On about April 22, Mr. Grieb also called Mr. Willard. He told him of the Simkins offer. He told Mr. Willard that offer would be rejected. Mr. Grieb said that he felt morally obligated to Rand-Whitney.

On April 24, Mr. Simkins raised his company's offer to 4.5 million dollars cash, all up front. At this point, Mr. Grieb had come under intense pressure from the shareholders of Robertson, who wanted more money. Mr. Grieb called Mr. Kraft, and told Mr. Kraft of the Simkins offer. He also told Mr. Kraft that he had informed Simkins of the commitment made to Rand-Whitney. He sent Mr. Kraft Exhibit 30, the telegram with his note that says "have called and told (meaning Simkins) we have made a commitment." Mr. Grieb then spoke with Mr. Willard and said the parties still had a deal. They did discuss, at Mr. Grieb's initiative, accelerating the purchase and sale in order to perfect that deal.

On about April 25th, 1986 the minutes of the April 17th Board meeting, that is Exhibit 20, were mailed to the directors of Robertson. At about the same time some of those directors saw the April 18 letter, Exhibit 28. I find their reactions in this period meaningful. In the period prior to April 30, Mr. Morrison told Mr. Powers that the April 18 letter was a one-way option in favor of Rand-Whitney. In the same period, Mr. Larsen said he didn't know if that letter was binding. In that same period, Mr. Tracy said he was confused about whether the letter was binding. Prior to April 30th, I find that there is no evidence that any director claimed that the April 18 letter was not binding, or that Mr. Grieb was not authorized to enter into a binding agreement, or that the April 17 minutes regarding Grieb's authority were incorrect.

On April 25th, Rand-Whitney's law firm Bingham, Dana & Gould sent a draft of the purchase and sale agreement to Powers & Hall attorneys for Robertson.

On April 30th, 1986, the Board of Robertson met again. There are no minutes for that meeting, nor was any other contemporaneous record offered to the Court. There was, however, considerable testimony on the subject.

The situation relating to the Simkins offer was discussed. Mr. Powers said it might be a breach of the directors' fiduciary duty not to accept the higher offer. A measurable part of that money would have accrued to his benefit. Mr. Morrison said that a failure to accept the higher offer would run the risk of a shareholder suit. Mr. Bailey said, in his view, the April 18th letter was not an enforceable agreement because it was missing essential terms such as the dates on which the uncollectable accounts receivable and obsolete inventory would be bought back.

At this point, Mr. Grieb was under great pressure from the shareholders of Robertson who wanted to accept the higher Simkin price. He was repeatedly accused of having a secret sweetheart deal with Rand-Whitney for extended continued employment.

On April 30, Mr. Grieb did express the opinion that the April 18 letter was not legally binding. About the same time he got very ill and went home.

On April 30, no director of Robertson claimed that Grieb was not authorized on April 17th to enter into a binding contract. Nor did any director then claim that the minutes of the April 17th meeting were then incorrect with regard to the resolution concerning his authority.

On April 30, the Board decided to reopen the bidding for Robertson. On May 1, 1986, the law firm of Powers & Hall sent to Rand-Whitney's lawyers, Bingham, Dana & Gould, a letter indicating that Rand-Whitney's proposal to buy Robertson had been rejected "on the basis that the P & S submitted by Rand-Whitney was not in the best interests of the shareholders of Robertson." There had been no discussion between representatives of Robertson and representatives of Rand-Whitney regarding the draft purchase and sale agreement furnished a week earlier by Bingham, Dana & Gould.

I find that the rejection of that purchase and sale agreement by Robertson did not relate in any way to the terms of the draft purchase and sale agreement prepared by Bingham, Dana & Gould. The rejection was as a result of a desire by Robertson to accept the higher Simkins offer. I also find that by failing to proceed with Rand-Whitney, Robertson breached its April 18, 1986 agreement with Rand-Whitney to sell its assets and to cooperate in good faith to, among other things, prepare a purchase and sale agreement.

On May 5, 1986, this lawsuit was filed. On May 6, 1986, a temporary restraining order maintaining the status quo was issued. On May 15, 1986, the law firm of Powers & Hall sent Rand-Whitney and others a proposed purchase and sale agreement for the assets of Robertson including terms which would be acceptable to Robertson, that is Exhibit 38 in this action.

On June 9, 1986, Mr. LaCour, Mr. Powers' nephew and the secretary of Robertson, was present at a hearing in this court in which Simkins sought to intervene in this action. In the course of that hearing, he heard counsel for Simkins argue for intervention based on the claim that Rob-

ertson would not, in this action, assert that Mr. Grieb lacked authority to enter into a binding contract on April 18.

On June 10, 1986, the Robertson Board met again. Mr. LaCour then raised for the first time the issue of the accuracy of the April 17 minutes concerning Mr. Grieb's authority. Mr. LaCour then claimed that Mr. Grieb had not been authorized to enter into an agreement. He claimed that the words "letter of intent" were used instead because the Board of Robertson did not intend to authorize Mr. Grieb to enter into a binding agreement on its behalf. He proposed correction of the April 17 minutes to substitute the words "letter of intent" for the word "agreement" in the relevant resolution. The Board concurred.

This was the first time that anyone at Robertson had raised the question of Grieb's authority to enter into a binding agreement or the accuracy of the minutes. I find neither contention credible.

I also find that by June 10, 1986, the Board knew that Robertson Paper Box Company had made money in April 1986. I also find that Robertson Paper Box Company made money in May 1986.

With regard to the April 18, 1986 letter, I find that it contains all of the essential terms necessary to constitute an agreement, that is a contract capable of being specifically enforced. Paragraph 1 of Exhibit 28 which, as I said, will be appended to this opinion, indicates that all of the assets of Robertson Paper are to be acquired with the exception of certain explicitly specified assets. When Exhibit 44, the statement of assets to be sold, is read in connection with the balance sheet, documents such as Exhibit 90 and Exhibit 54 revised as of the appropriate closing date, the book assets of Robertson being sold are, or would be, readily ascertainable. They include all the land. They also include the equipment leased or used by Connecticut Printers.

The April 18, 1986 letter includes the express provision that among the assets of Robertson Paper being sold are all "con-

tract rights." I interpret "contract rights" to include the union contracts, the right to receive rent from Connecticut Printers for the equipment used in their business and the related obligation to sell, if the purchase option is exercised in 1988. I also interpret "contract rights" to include un-booked orders from customers and un-booked orders to suppliers, which in my view would constitute contract rights to sell to a customer and to buy from a supplier, and to get paid or to pay in due course.

I also, however, alternatively find that neither the union contracts, nor the un-booked orders from customers or to suppliers of Robertson, nor the Connecticut Printer equipment issues are essential terms of an agreement to sell the otherwise specified assets of Robertson to Rand-Whitney. In the context of this case, those items are not essential.

I note that paragraph 1 also clearly describes the liabilities being assumed.

Paragraph 2 provides a clear formula for calculating the purchase price at the time of closing. I find that the promissory note is adequately described. The exact text of that note, while possibly a desirable term, is not an essential term.

With regard to paragraph 3 concerning the repurchase of unpaid accounts receivable and obsolete inventory, I find that the contract plainly provides an obligation of Robertson to buy back any uncollectable accounts receivable and obsolete or unsaleable inventory. This is, as Mr. Sanagra testified, an insignificant item. Generally accepted accounting principles provide a standard for determining what, if any, accounts receivable are uncollectable and what, if any, inventory is obsolete. In any event, a *de minimus* amount of money is involved. Mr. Sanagra's testimony demonstrates at most each item ought to come to about $10,000. This is not a material amount of money in the context of this transaction.

There are no dates specified for calculating whether any inventory or accounts receivable must be repurchased by Robertson. As I will explain further in the con-

clusions of law, that is the type of term the Court is permitted to imply, if necessary.

With regard to paragraph 4 of the April 18 agreement, 4(a) does condition consummation of the transaction on completion of due diligence by Rand-Whitney. That due diligence was substantially complete by April 17, and Rand-Whitney was then obliged to proceed in good faith to complete that due diligence.

Paragraph 4(b) conditions the transaction on the negotiation and execution of asset purchase documentation satisfactory to Rand-Whitney containing representations, warranties, assurances as to titles to the assets of Robertson Paper and other terms and conditions of indemnities customary in corporate acquisitions agreements. I find that some of those provisions are boiler-plate. I accept that some of these customary provisions are subject to negotiation. I find that none of the provisions in the later category are essential to the agreement in this case.

I find that, for example, with regard to indemnification, it is Robertson Group which is a party to the agreement to sell, or cause the sale of, the Robertson Paper Company assets. They signed the agreement. The Boards meet simultaneously. Robertson Group acts through the same people as an alter ego for Robertson Paper Box.

As no indemnity agreement was specifically negotiated in this case, I find that the issue of indemnities would be covered by the provisions of the common law, the applicable provisions of the Uniform Commercial Code, and be governed or influenced by the explicit, express representations made by Mr. Grieb at various times in the course of the transaction. In any event, I do not find the indemnity issue to be a material or an essential issue in this case. The condition of the equipment was disclosed early on to Rand-Whitney, which knew that substantial investment in certain areas, at least, was required. In addition, much of the due diligence was complete by April 18.

Finally, in an asset acquisition, as opposed to a stock acquisition, the parameters of potential liability are limited since it is plain what assets and related liabilities are being assumed. It might be covered by warranties. I also find that the environmental issue or the possibility of environmental problems is not a material issue in this case.

In general, I find that this transaction can, if necessary and finally determined to be appropriate, be consummated solely on the basis of the April 18 letter. I also have in mind the comment made by counsel for Robertson in closing argument last week that should we reach this point, he and his client might want to reflect on whether it would be preferable or more appropriate to order specific performance in the context of Exhibit G, the purchase and sale agreement prepared by Powers & Hall integrated with the terms of the April 18 letter, as I'll elaborate at the conclusion of this. That's one of the items I want the parties to confer on, or agree on, or brief their differences on.

Finally, with regard to the findings of fact, I find that specific performance of the contract is both possible and appropriate. As I indicated, I find the contract sufficiently explicit to be specifically enforced. We have unique assets at issue here, like the land and the mill, the type of assets frequently subject to equitable relief.

I also find that Robertson presents a unique opportunity and value to Rand-Whitney. Rand-Whitney has a special need for the additional capacity that Robertson would provide, which is not otherwise available. Rand-Whitney has need for certain special equipment which is at Robertson and would not be readily accessible. The Robertson mill provides a unique opportunity for vertical integration of Rand-Whitney, because it can supply the various Rand-Whitney facilities with paper products they are now buying on the open market. In addition, the Connecticut location of Robertson has tangible value for Rand-Whitney's shipping operations. Thus, I find that Rand-Whitney will be irreparably harmed if the agreement to purchase Robertson assets is not specifically enforced, and that Rand-Whitney has no adequate remedy at law.

Finally, for this aspect of the opinion, I find that the April 18 letter is a contract, that is a binding agreement. I find that Mr. Grieb was authorized to enter into that agreement on behalf of Robertson. I find that Rand-Whitney relied to its detriment on the representations of Mr. Grieb and Robertson and that Mr. Grieb and Robertson knew of this reliance. I find that Robertson breached its agreement with Rand-Whitney. I find that Rand-Whitney at all times acted in good faith. I also find that specific performance of the April 18 agreement is possible and appropriate.

Now, moving to the related conclusions of law, which overlap somewhat because some of these are mixed issues of law and fact, I find the following conclusions of law based on the language of the April 18 letter which I have rigorously construed against Rand-Whitney, because they played a bigger role in drafting it, and also from the surrounding circumstances, all of which were very graphically presented to me in the course of the lengthy trial in this matter.

I find, as I've said earlier, that the April 18, 1986 letter constitutes a contract, an enforceable agreement between Rand-Whitney and Robertson, including, but not limited to, Robertson Group Inc. I find that specific performance of that contract is possible and appropriate.

With regard to the question of whether the April 18, 1986 letter constitutes a contract, I find that on April 18, 1986, Mr. Grieb was authorized to enter into a binding contract for Robertson. I also find that in signing the letter, Mr. Grieb intended that Robertson and Rand-Whitney would both be bound, while recognizing that possible future contingencies could cause the agreement to cease to be binding.

■ I accept that Mr. Grieb in his mind may have considered the letter to be a letter of intent. That does not alter the

conclusion that he intended that the parties be bound by it. Nor does the fact that he may have used, or did use, the words "letter of intent" alter this conclusion. As many cases demonstrate, a letter of intent may be binding or nonbinding. It depends on the intentions of the parties. Two of the cases that illustrate this proposition are *Arnold Palmer v. Fuqua*, 541 F.2d 584 (6th Cir.1976) and *Frank Horton Co. v. Cook Electric Co.*, 356 F.2d 485 (7th Cir. 1966).

I also find that in signing the letter, Mr. Willard also intended that Robertson and Rand-Whitney would be bound, while recognizing that possible future contingencies could cause the agreement to cease to be binding.

■ The fact that a further purchase and sale agreement was contemplated does not defeat the existence of a contract. The Supreme Judicial Court of Massachusetts said that, in effect, in the case of *Nigro v. Conti*, 319 Mass. 480, 482, 66 N.E.2d 353 (1946). The First Circuit Court of Appeals has recognized and reiterated that proposition in the *Chedd-Angier Production Company v. Omni*, 756 F.2d 930 (1st Cir.1985). In this respect, Massachusetts law is consistent with the black letter law reflected in the Restatement Second of Contracts, Section 27.

The fact that the contemplated purchase and sale agreement in this case was expected to include additional terms, and not just memorialize terms already addressed and agreed upon, does not defeat the existence of a contract where, as here, the parties already agreed on all of the essential terms. The First Circuit's decision in *Labrecque v. Niconchuk*, 442 F.2d 1094, 1098 (1st Cir.1971), addresses that issue.

■ The key issues of law which the Court has been obligated to address, and has addressed, are whether the parties intended to be bound when they signed the contract and, if so, whether the initial agreement included all of the essential terms. I've answered both of those questions, "yes."

In this case I find that contemplation of a future purchase and sale agreement did not indicate that the parties believed they were in a stage of preliminary negotiations. Rather, the anticipation of a future document indicated, among many other things, that the parties felt they had an agreement that had to be formally finalized to be consummated.

I look at paragraph 4(b) of the April 18 letter which contemplates a purchase and sale. I look at paragraph 8 of that letter which reflects the undertaking to cooperate in good faith in developing that agreement, among other things. I look at the last sentence of the letter which expressly provides that it is the mutual intention of both parties to enter into a definitive asset purchase agreement to consummate the transaction. They, among other things, cause me to view this case as the First Circuit viewed the case it decided last month, *Computer Systems of America v. IBM*, 793 F.2d 1 (1st Cir.1986). I find that in this case, like that case, that in the April 18, 1986 letter both sides are stating that they intend now to be bound and further bind themselves to proceed in good time and good faith to the execution of a more formal document.

I find that the fact that the agreement was subject to the completion of a due diligence investigation satisfactory to Rand-Whitney does not defeat the existence of a contract in this case. The Defendants have contended that this provision in paragraph 4(a) makes Rand-Whitney's obligations illusory. I find this contention is incorrect.

■ In Massachusetts, by law, every contract implies good faith and fair dealing between the parties, as the Supreme Judicial Court said in *Kerrigan v. City of Boston*, 361 Mass. 24, 33, 278 N.E.2d 387 (1972). That obligation was explicitly expressed in this case. In this contract, paragraph 8, states "Robertson and Rand-Whitney will cooperate in good faith expeditiously," in, among other things, the taking of the actions necessary to carry out the agreement. I find that Rand-Whitney was

bound by the April 18th letter unless it was released from that obligation because its good faith, due diligence investigation revealed a material, undisclosed problem. The cases consistent with this finding include *Gregg v. U.S. Industries*, 715 F.2d 1522, 1535 (11th Cir.1983), and *America Cyanamid v. Elizabeth Arden*, 331 F.Supp. 597 (S.D.N.Y.1971). In effect, I find, as a matter of law, that this case is to a certain extent analogous to the *Nigro* case decided by the Supreme Judicial Court in which there was an agreement that was binding unless a future contingency occurred (that was the failure of the liquor licensing authority to approve the transfer in question).

As I indicated earlier, I also find that in this case the due diligence issue is not a material, essential issue. Much information about the assets being acquired was revealed to or discovered by Rand-Whitney prior to April 18. Disclosure of that information would strictly limit Rand-Whitney's discretion in seeking to fail to consummate the transaction because of something disclosed in due diligence after April 18, 1986. It could not use bad faith or contrive a problem perceived in due diligence as a pretext for getting out of this contract if it decided to do so.

In effect, I regard the due diligence provision as analogous to the concepts of fraud that would be applicable to the contract even if there was no due diligence provision. Ordinarily, when parties enter into a binding contract, that is what they understand to be a binding contract, it can nevertheless be set aside if there has been fraud. Here, I find that there is a binding contract. It can only cease to be binding if Mr. Grieb's representations, or any other material representations, were misleading or are not satisfied in a material respect.

I've also considered whether the existence of a contract in this case is defeated by Mr. Willard's unarticulated and mistaken belief on April 18 that the Robertson shareholders would have to vote to approve the asset acquisition. I find that it is not. This case does not involve mutual mistake.

Mr. Grieb knew that shareholder approval was not required. On April 18, when he signed the letter, Mr. Grieb intended that the letter bind both Robertson and Rand-Whitney. Generally, a bargain is not voidable in favor of a party who made no mistake. That proposition can be found, among other places, in 3 Corbin on Contracts, 1963, Section 611.

I have considered Mr. Willard's mistaken belief in the context whether he thought Rand-Whitney was bound when he signed the letter. I have taken his mistaken belief into account in the context of the many other pieces of evidence that bear on this issue. I find that in view of all the circumstances, Mr. Willard, when he signed the letter, believed that Rand-Whitney was bound by it; so did all the other Rand-Whitney representatives present on April 18th.

I have also considered Mr. Willard's mistaken belief as it might relate to the issue of whether he thought Robertson was bound by the April 18 letter when he signed it. I find, having again considered all the circumstances and the considerable evidence relating to this issue, that he did believe that Robertson too was intending to be bound and would be bound when Mr. Grieb signed that letter. He had been told by Mr. Grieb that Board approval would be tantamount to shareholder approval with regard to the stock acquisition that was discussed earlier. Mr. Powers, the controlling shareholder did indeed vote to approve the sale to Rand-Whitney at the Board meeting on April 17.

Once again, and I think on this issue the *Nigro* decision is even more analogous, the parties at most intended to be bound unless something in the future caused them to cease to be bound. In *Nigro*, the parties intended to be bound to make the sale unless the liquor licensing authority did not approve the transfer in question. In this case, at most, I find that Mr. Willard intended and expected that the parties would all be bound unless the Robertson shareholders failed to approve the transaction, something that he did not consider a real possibility. In addition, each of the other

Rand-Whitney representatives correctly understood that no shareholder action was required. They all believed that both parties would be contractually bound when the April 18 letter was signed.

As I said earlier, I find that the agreement of April 18 contains all of the essential terms of an enforceable agreement. There are some customary terms, not included in the letter, which one ordinarily finds in more elaborate purchase and sale agreements. I find that the reason there is not a more formal and elaborate purchase and sale agreement including these customary terms is the bad faith of the Defendant Robertson.

■ The Defendant contracted to negotiate and execute a purchase and sale agreement with additional terms, but none of those additional terms are essential terms. The Defendant breached its agreement to do this, that is to negotiate and execute a purchase and sale, by refusing to negotiate. The law in Massachusetts is that one who prevents the performance of a contract cannot take advantage of its non-performance. *Fitzgerald v. Pacella* 2 Mass. App.Ct. 240, 242, 310 N.E.2d 379 (1974). That is the situation that Robertson is now in.

As I indicated earlier, the Court recognizes that there are certain items that will need to be implied to specifically enforce the April 18 agreement, such as the period for due diligence, the closing date, and the dates for buying back the *de minimus* amounts of uncollectable accounts receivable or obsolete inventory. I find that these items are of the sort that the law permits the Court to imply on a reasonable basis. *McKinney v. National Dairy Counsel*, 491 F.Supp. 1108, 1110–11 (D.Mass.1980); Corbin on Contracts, Section 95 at 40.

Although I won't go into it in detail because we are now approaching two hours, and I have another matter waiting, I reread and seriously considered the cases Robertson relies upon in asserting that the essential terms of a contract were not agreed upon or reflected in the April 18 letter. I find each of them distinguishable.

*Blair v. Cifrino*, 355 Mass. 706, 247 N.E.2d 373 (1969), involves real estate development. There was no manifestation of acceptance found, and the writing in question did not cover such essential terms as the method of making payment or the way that the Plaintiff would share in the development of the property at issue, including issues relating to calculation of gross rentals. In *Saxon Theatre Corporation v. Sage*, 347 Mass. 662, 200 N.E.2d 241 (1964), there was no precise description of the land to be leased. The amount of rent to be paid was left open. The identity of the parties was not settled, and the plans for the theatre to be built were not agreed upon.

In *Rosenfield v. United States Trust*, 290 Mass. 210, 195 N.E. 323 (1935), involving the renovation of a store, there was no agreement on the new store front. There was no agreement on the cost. There was no agreement on material items, like payment for heat and water.

In *Tull v. Mister Donut Development Corp.*, 7 Mass.App.Ct. 626, 389 N.E.2d 447 (1976), the Court found that only the rudiments of the deal were agreed upon. Critical issues like the financing of construction and the timing of construction were not agreed upon. I recognize that the *Tull* case also involved an issue injected in this case regarding who would provide a particular indemnity. I find that the relation of the parties to the indemnification in *Tull* seems to be dramatically different than the relationship of Robertson Group and Robertson Paper Box, the parties to the indemnification in this case. While indemnification may have been one of a number of terms deemed essential in the context of the facts of *Tull*, it is not essential in the context of this case for the reasons I described earlier.

■ I also find, as a matter of law, that Robertson is equitably estopped from disputing the validity of the contract in question, and, particularly, from asserting that Mr. Grieb lacked authority to bind the company. The Board of Robertson knew that

Rand-Whitney would forgo its West Coast opportunities to deal with Robertson if the Robertson Board approved the transaction. Mr. Grieb knew this. Mr. Grieb represented that he had authority on April 18th to enter into a binding agreement with Rand-Whitney. Rand-Whitney relied on this representation in signing the April 18 letter and not pursuing its possible West Coast acquisitions because it believed it had a binding agreement with Robertson. Mr. Grieb was acting on behalf of Robertson also through all of this. Thus, I find that Robertson is estopped from asserting that Grieb's signature on the April 18 letter did not bind Robertson. *Cellucci v. Sun Oil Company*, 2 Mass.App.Ct. 722, 320 N.E.2d 919 (1974), *affirmed* 368 Mass. 811, 331 N.E.2d 813 (1975).

I share the perception that I think counsel have that the views of Massachusetts courts on that principle may be cloudy in view of the 1983 decision in *Rubel v. Hayden*, 15 Mass.App.Ct. 252, 444 N.E.2d 1306 (1983). I do not view this finding as critical since the estoppel point is an alternative to the principal finding I have made about the existence of an actual agreement. I do, however, think that *Cellucci* is the persuasive analogy in this case, and that equitable estoppel provides an appropriate alternative for conclusions that I have reached in this case.

■ Finally, not to cover it too much again, I find that specific performance is at least part of a possible and appropriate remedy in this case. As I have described earlier, I think that the April 18 letter, read without paragraph 4(b) concerning the purchase and sale, contains all of the essential terms of an enforceable agreement and is sufficiently explicit to make the enforcement of specific performance practicable. I would only need to imply dates for completing due diligence, closing, and determining whether any of the accounts receivable or inventory ought to be bought back by Robertson.

As I have said earlier, the Robertson assets present a unique opportunity for Rand-Whitney because of the synergies between the two enterprises. The *Nigro* case recognized the principle that equity will require specific performance of an agreement to sell stock in a closely held company. This is an analogous situation.

It is also well established that specific performance is appropriate when, as here, land and buildings are in issue. *Allen v. Rakes*, 359 Mass. 1, 267 N.E.2d 628 (1971). In fact, this case is very similar to the illustration in the Restatement Second of Contracts, Section 359 which states, "If A contracts to sell his business including land, buildings, and stock and trade to B, A repudiates the contract and B sues for specific performance of the contract as a whole, specific performance of the entire contract may be granted even though the stock in trade is of a kind that can be purchased elsewhere."

There are, however, a few open issues with regard to specific performance. Those are issues that first you and then I will address in the near future. One I have alluded to earlier, that is the question of whether specific performance should be compelled based solely on the April 18 letter or on the basis of Exhibit G, that is the integration of the purchase and sale agreement drafted by Powers & Hall, and the terms of the April 18 letter. Mr. Cavers indicated that if we reached this point, he would like an opportunity to reflect on that, to consult his client, and to inform the Court of their views. I would find that process helpful.

Other issues that you should address are the appropriate time for due diligence, the appropriate closing date, the appropriate dates for determining whether any of the accounts receivable and inventory should be bought back.

There is also another issue that I want you to address. At this point I am not sure whether specific performance is the only remedy that ought to be ordered. The evidence has indicated (apparently to the surprise of Robertson, which felt it was losing money when we first met in early May) that the Robertson Paper Box Company is now earning a monthly profit. That

raises, in my mind, the question of whether I should order that Robertson be required to pay Rand-Whitney any profits earned after June 30, 1986, the closing date contemplated by the April 18, 1986 agreement.

Accordingly, I would like the parties to consider these issues, to meet, and to see whether they can agree, without prejudice to the Defendant's right to appeal, if it believes that this decision is incorrect, on an order implementing this decision. If you can agree, particularly on the question of whether specific performance ought to be ordered on the basis of April 18 letter alone or Exhibit G, I would like to receive a joint proposed order from you. If you disagree, I would like to receive separate proposed orders and related briefs. I would like you to do all of that and make your filings by Friday, August 15, which is two weeks from tomorrow. Recognizing, however, the time of year that we are at, I will see counsel very briefly in the lobby momentarily.

### JUDGMENT BY CONSENT

This case having come before the Court for jury-waived trial on an expedited basis on the issues of whether the parties entered into a binding agreement for the sale of the assets of Robertson Paper Box Co., Inc. to Rand-Whitney Packaging Corp. and whether any such agreement should be specifically enforced (but reserving the issue of damages), the Court having delivered its Findings of Fact and Rulings of Law to counsel on July 31, 1986, and the parties now having reached agreement on this form of Judgment, the Court now enters Judgment By Consent as follows:

1. Judgment for the plaintiff on the issues tried to the Court.

2. The defendants are ordered to specifically perform their obligations as set forth in the letter of April 18, 1986 (appended hereto as Exhibit A) as that letter has been construed and interpreted by the Court in the Court's Findings and Rulings of Law and as modified herein:

(a) The closing date, set forth in paragraph 8, shall be October 31, 1986 or such earlier date as may be mutually agreed upon by the parties. The due diligence investigation by Rand-Whitney under paragraph 4(a) shall be completed on or before the closing date.

(b) Paragraph 4(b) shall not be a condition of closing and said sub-paragraph shall be deemed deleted from the letter agreement. The parties may but are not required to enter into further asset purchase documentation in anticipation of the closing.

(c) The Court orders that defendants shall buy back from Rand-Whitney all accounts receivable which remain unpaid for a period of 90 days after closing, and all inventory which is determined by Rand-Whitney to be obsolete or unsaleable 180 days after closing. The Court finds that implication of these time periods is reasonable and fairly effectuates the intentions of the parties.

(d) The parties agree that the three pieces of equipment now leased by Robertson Paper Box to Connecticut Printers will be excluded from the sale of assets to Rand-Whitney. Specifically, this means that the book value of those three pieces of equipment, as of the closing date, will be deleted from the purchase price (and from the amount of the cash payment required in the April 18 letter).

(e) Rand-Whitney agrees to add $100,000 to the amount of the note contemplated by the April 18 letter, which note is to be calculated in accordance with the procedures contemplated by sections 1.4(c) and (d) of the document marked at trial as Exhibit G for identification and which note will be in the form appended hereto as Exhibit B.

(f) All amounts received by Rand-Whitney after closing from customers of Robertson Paper Box shall be applied as follows: (i) against the invoice or invoices designated by each customer for application of such payment or, in the absence of such designation, (ii) against the oldest undisputed amount

or amounts owing to Robertson Paper Box from each such customer. Any directions given by Rand-Whitney for handling of accounts receivable prior to closing shall be consistent with this provision.

(g) Robertson shall deliver at the closing a quitclaim deed (containing the quitclaim covenants prescribed by Mass. Gen.Laws c. 183, § 17) covering all real estate owned by Robertson Paper Box Co., Inc. as of April 18, 1986, except that said deed may exclude any warranties of title for matters in existence prior to August 25, 1984 with respect to the railroad spur track and underlying land on the industrial site or to the portion of the underground tunnel from the plant to the warehouse passing beneath said railroad spur track. This provision supercedes section 4.3(a) of Exhibit G (see paragraph 4 of this Judgment by Consent) to the extent that the latter provision is inconsistent with it.

(h) As of the closing, Rand-Whitney will assume Robertson Paper Box's unbooked orders from customers and its unbooked orders to suppliers to the extent such unbooked orders reasonably arose in the ordinary course of business.

3. All rights and remedies arising under common and statutory law shall apply to this transaction, including any contemporaneous or further documentation, unless explicitly displaced by specific agreement between the parties.

4. The parties are directed to fulfill their obligations under the April 18, 1986 letter agreement and this Judgment by Consent reasonably, and in good faith, and pursuant to any further or contemporaneous agreements between them relating to the implementation of this Judgment by Consent. In implementing the closing of the transaction under the terms of the April 18, 1986 letter agreement, the parties shall follow the provisions and procedures set forth in the following sections of Exhibit G: section 1.4(a) (preparation of closing balance sheet); section 1.4(b) (taking of physical inventory); section 1.3 and 4.3(a) and (c) (actions at the closing regarding exchange of instruments). If it becomes necessary, a party may seek a supplemental order from the Court to ensure enforcement of this Judgment by Consent in accordance with its terms.

5. Rand-Whitney, no later than August 25, 1986, will have the right (but not the duty) to make any and all management decisions at Robertson Paper Box Co., Inc., including, without limitation, the immediate right to schedule production of orders as it sees fit. In acting in its management capacity until the closing of the transaction, Rand-Whitney will be acting as an authorized agent of the Robertson Paper Box Co., Inc. and will incur no liabilities either to Robertson or to third parties for action taken in the ordinary course of business. Consistent with that relationship, Rand-Whitney will not be entitled to any profits or be responsible for any losses from the operations of Robertson Paper Box Co., Inc. until after the closing. Any net profits earned before closing shall belong to Robertson, such net profits to be determined in accordance with generally accepted accounting principles applied consistently with prior application to Robertson Paper Box. Nothing herein shall modify or limit Rand-Whitney's rights pursuant to § 2(c) of this Judgment By Consent relating to receivables arising or inventory acquired or manufactured during the period of Rand-Whitney's management of Robertson Paper Box prior to closing.

6. Until the closing, Rand-Whitney, in performance of whatever management activities it undertakes pursuant hereto, will act reasonably and take no actions outside the ordinary course of business. Until the closing Rand-Whitney shall not sell or oth-

erwise dispose of, or purchase (with funds of Robertson) any capital asset with a market value in excess of $1,000, or any capital assets of market value aggregating in excess of $5,000, without the prior written consent of Robertson, and in no event shall Rand-Whitney sell or otherwise dispose of, or purchase (with funds of Robertson) any capital asset other than in the ordinary course of business unless Robertson gives its prior written consent. Until the closing Rand-Whitney shall not, by intentional act or omission, decrease or terminate Robertson Paper Box existing insurance.

7. Upon full performance by Robertson Group and Robertson Paper Box of their obligations under this Judgment By Consent, Rand-Whitney will release Robertson Group and Robertson Paper Box Co., Inc. from any claims for damages or costs arising from or in connection with the breach of the April 18 letter agreement by Robertson or the litigation of this case. Until such full performance, this case is subject to being reopened upon motion of Rand-Whitney, if otherwise appropriate, for pursuit of any such claims. Upon full performance by Rand-Whitney of its obligations under this Judgment by Consent, Robertson Group and Robertson Paper Box will release Rand-Whitney from any claims arising from the litigation of this case. Until such full performance, this case is subject to being reopened upon motion of defendants, if otherwise appropriate, for pursuit of any such claims. No further documentation is necessary to memorialize these releases. Such releases in no way release any obligations arising from this Judgment By Consent or the appended Note.

8. The defendants waive their right to appeal this Judgment By Consent or to seek any stay of this Judgment by Consent in any form or fashion whatsoever.

Upon consent of the parties, duly noted below, IT IS SO ORDERED this 4th day of September, 1986.

EXHIBIT A

**RAND–WHITNEY PACKAGING CORP.**
BOX 120,
LEOMINSTER,
MASSACHUSETTS 01453,
Area Code 617 537–1701

April 18, 1986

Board of Directors
The Robertson Group, Inc.
Montville, Connecticut 06353

Gentlemen:

Rand-Whitney Packaging Corporation ("Rand-Whitney") is pleased to offer to purchase the operating assets of your subsidiary, Robertson Paper Box Co., Inc. ("Robertson Paper"), on the following terms and conditions:

1. *Purchased Assets and Assumed Liabilities.* Rand-Whitney will purchase all of the assets of Robertson Paper (including, without limitation all inventory, accounts receivable, contract rights, real property, machinery and equipment, furniture, fixtures, intellectual property, books, records, customer lists and trade names used in connection with the operations of Robertson Paper) with the exception of cash, certain life insurance policies, deferred taxes, and intercompany receivables. Rand-Whitney will assume all of Robertson Paper's liabilities for trade accounts payable (excluding any intercompany payables), accrued expenses payable in connection with Robertson Paper's operations and liabilities payable with respect to the purchase price of, or under leases for, machinery and equipment used in connection with Robertson Paper's operations. Rand-Whitney will assume no other liabilities of Robertson Paper.

2. *Purchase Price.* The purchase price for the assets will be equal to the amount obtained by subtracting $400,000 from the amount by which the book value as of the closing date of the assets being purchased by Rand-Whitney exceeds the book value as of the closing date of the liabilities being assumed by Rand-Whitney, in each case calculated in accordance with generally accepted accounting principles. The purchase price will be payable at the closing

by delivery of $1,800,000 and Rand-Whitney's non-negotiable promissory note in the principal amount of the unpaid balance of the purchase price maturing nine years after closing. The outstanding principal of the note will bear interest at the rate of 9% per annum payable quarterly in arrears. The principal amount of the note will be payable in six equal annual installments commencing four years after closing.

3. *Repurchase of Unpaid Accounts and Obsolete Inventory.* Robertson Paper will buy back from Rand-Whitney all accounts receivable purchased by Rand-Whitney which remain unpaid for a period after closing to be specified in the asset purchase documentation and all inventory purchased by Rand-Whitney which is determined by Rand-Whitney to be obsolete or unsaleable within a period after closing to be specified in the asset purchase documentation. The repurchase price shall be equal to that portion of the purchase price which was attributable to such items.

4. *Conditions.* Rand-Whitney's offer to purchase the assets of Robertson Paper is subject to the fulfillment of the following conditions:

(a) completion by Rand-Whitney of a due diligence investigation of Robertson Paper satisfactory to Rand-Whitney; and

(b) negotiation and execution of asset purchase documentation satisfactory to Rand-Whitney containing representations, warranties, assurances as to title to the assets of Robertson Paper and other terms, conditions and indemnities customary in corporate acquisition agreements.

5. *Employment Agreements.* It is understood and agreed by both parties that reasonable efforts will be made to obtain the execution of employment agreements satisfactory to Rand-Whitney with certain key employees of Robertson Paper.

6. *Access to Information.* Immediately following acceptance of this letter, you will provide Rand-Whitney and its representatives access to the books, records, financial statements and properties of Robertson Paper to enable Rand-Whitney to complete its due diligence examination. Any non-public or confidential information of Robertson Group, Inc. or Robertson Paper disclosed to Rand-Whitney or its representatives in the course of its due diligence examination shall be held in confidence by Rand-Whitney.

7. *Expenses.* Each party will pay its own expenses and costs incidental to the completion of the transactions contemplated hereby.

8. *Completion of Transaction.* Rand-Whitney and Robertson Group, Inc. will cooperate in good faith and expeditiously in the preparation of the documents and the taking of other actions necessary to carry out the transactions described in this letter. It is expected that a purchase and sale agreement will be finalized as soon as possible and that a financial statement for Robertson Paper will be prepared as of the closing date in accordance with generally accepted accounting principles. The closing shall take place on June 30, 1986 or such earlier date as may be selected by Rand-Whitney.

If the foregoing is satisfactory to you, please evidence your acceptance of this letter by signing the enclosed copy and returning it to us no later than April 21, 1986. Failure to return a copy of this letter by April 21, 1986 will result in the termination of the offer contained herein. It is understood that upon your acceptance of the terms hereof, this letter shall constitute a confirmation of the mutual intention of both parties to enter into a definitive asset purchase agreement to consummate the transactions described herein.

Very truly yours,

RAND–WHITNEY
PACKAGING CORPORATION

By: /s/ Nicholas B. Willard

Title: Vice President &
Gen. Mgr.

Accepted this 18 day of April, 1986,

ROBERTSON GROUP, INC.

By: /s/ J. Richard Grieb

Title: Chairman & Chief Executive Officer